UNITED STATES of America, Plaintiff–Appellee,

v.

Scott KOENIG, Defendant–Appellant.

UNITED STATES of America, Plaintiff–Appellee,

v.

Mark KOENIG, Defendant–Appellant.

UNITED STATES of America, Plaintiff–Appellee,

v.

Jacklyn BOBBY, Defendant–Appellant.

UNITED STATES of America, Plaintiff–Appellee,

v.

Robert HUSSEY, Defendant–Appellant.

UNITED STATES of America, Plaintiff–Appellee,

v.

Bobbi Jo BOBBY, Defendant–Appellant.

Nos. 89–50523, 89–50524, 89–50530, 89–50533 and 89–50547.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Aug. 13, 1991 (Nos. 89–50523, 89–50524, and 89–50530).

Submitted Aug. 13, 1991 * (Nos. 89–50533 and 89–50547).

Decided Dec. 19, 1991.

---

* The panel unanimously finds this case suitable for decision without oral argument. Fed. R.App.P. 34(a) and Ninth Circuit Rule 34–4.

Charles Pereyra–Suarez, McKenna, Conner & Cuneo, Carlton F. Gunn, Deputy Federal Public Defender; Joseph F. Walsh, Los Angeles, Cal., Robert Hussey, Lompoc, Cal., John D. Robertson, Robertson & Sherron, Los Angeles, Cal., for defendants-appellants.

Vicki S. Marani, U.S. Dept. of Justice, Washington, D.C., for plaintiff-appellee.

Before WALLACE, Chief Judge, GOODWIN, Circuit Judge, and TANNER,** District Judge.

WALLACE, Chief Judge:

Mark Koenig, Scott Koenig, Jacklyn Bobby, Robert Hussey and Bobbi Jo Bobby (conspirators), appeal their sentences, following guilty pleas to conspiracy to produce and use counterfeit access devices and various other crimes in violation of 18 U.S.C. § 1029. The district court exercised jurisdiction pursuant to 18 U.S.C. § 3231. We have jurisdiction over these timely appeals pursuant to 28 U.S.C. § 1291. We affirm.

I

Through his work as a computer consultant, Mark Koenig gained access to information regarding automated teller machine (ATM) transactions. This data, which was transmitted from various ATM machines to the appropriate banking institution, was encoded to ensure confidentiality. In November 1988, Mark Koenig discovered a way to decode the information and, as a result, gained access to account and personal identification numbers.

Subsequently, he developed a plan to use the information to withdraw funds from numerous Bank of America accounts. He obtained the account numbers, personal identification numbers, and ATM card expiration dates for 7,470 Bank of America accounts. He also developed a method for manufacturing counterfeit ATM cards consisting of poster board and magnetic tape encoded with the stolen account information. He made several sample cards and verified that the cards functioned properly.

Jacklyn Bobby, Robert Hussey, Bobbi Jo Bobby, and Scott Koenig agreed to help Mark Koenig with his plan. Mark Koenig also asked his wife, Jacklyn Bobby, to contact another individual (the informant) and

ask her to participate in the conspiracy. The informant secretly notified the Secret Service of the plan and agreed to act as a confidential informant.

In various telephone conversations and meetings with the informant, the conspirators described their plan to use the counterfeit ATM cards during Presidents' Day weekend. Their final plan had Hussey working alone, the informant and Scott Koenig working as a team, and Mark Koenig and Bobby Joe Bobby also working as a team. Hussey and the two teams each intended to withdraw funds from ATM machines with the counterfeit cards.

Two weeks prior to President's day weekend, some of the conspirators met at Mark Koenig's home to manufacture ATM cards. At that time, Secret Service agents executed a previously obtained warrant. During the search, the agents seized approximately 1,480 encoded counterfeit ATM cards, 4,100 cards with magnetic tape that had not yet been encoded, and 800 cards to which magnetic tape had not yet been attached. They also found an encoding device that Mark Koenig brought home from work.

A six count indictment charged the conspirators with conspiracy to produce and use counterfeit access devices and with various other crimes in violation of 18 U.S.C. § 1029. Mark Koenig and Robert Hussey each pled guilty to all six counts. Mark Koenig was sentenced to 41 months' imprisonment, and Hussey was sentenced to 30 months' imprisonment. Jacklyn Bobby pled guilty to three of the counts charged, including conspiracy, and was sentenced to 30 months' imprisonment. Bobbi Jo Bobby pled guilty to two counts, including conspiracy, and was sentenced to a term of 21 months' imprisonment. Scott Koenig pled guilty to conspiracy and was sentenced to 18 months' imprisonment. The court ordered each conspirator to serve 3 years of supervised release and to pay $10,426 in restitution.

** Honorable Jack E. Tanner, United States District Judge, Western District of Washington, sitting by designation.

## II

The conspirators argue that the district judge erred by increasing their offense levels by 10 points based upon a finding that the cumulative loss intended by the conspiracy exceeded two million dollars. *See* United States Sentencing Commission, *Guidelines Manual,* § 2F1.1 (Oct. 1988) (U.S.S.G.) (unless otherwise indicated, all references to the Sentencing Guidelines will be to the Guidelines as amended in October 1988, which were the guidelines in effect at the time of sentencing). They contend that the district judge misinterpreted the relevant guidelines and commentary and miscalculated the intended loss. We review the district court's application of the Guidelines de novo (independently). *United States v. Davis,* 922 F.2d 1385, 1387 (9th Cir.1991) (*Davis*). Findings of fact made in the course of applying the Guidelines, however, are reviewed for clear error. *Id.* at 1387–88.

The district court determined that the appropriate measure of loss was the "intended" loss. Apparently, the district judge relied on application note 7 to section 2F1.1, which provides that "if a probable or intended loss that the defendant was attempting to inflict can be determined, that figure [should] be used if it [is] larger than the actual loss." U.S.S.G. § 2F1.1, comment. (n. 7). Although the conspirators appear to concede the applicability of this commentary, they argue that the term "intended loss" should be interpreted to mean "the probable loss which would have resulted from execution of the defendants' intended plan." Construing the term in this way, they argue that the district court erred by not making a finding that: (1) it was probable that the conspirators would have stolen over two million dollars pursuant to the intended plan, or (2) they would have varied from the intended plan had they not obtained over two million dollars.

The commentary to section 2F1.1 states that the "probable *or* intended" loss may be calculated. *Id.* (emphasis added). The phrase "probable or intended" is disjunctive. *See Davis,* 922 F.2d at 1392. If the district judge chooses to calculate the intended loss, there is no requirement mandating consideration of the "probable loss" that would result from the intended plan.

The conspirators' attempt to avoid the clear language of the application note by arguing that there was no intended loss in this case, since they only intended to use the cards to steal as much as possible during a fixed period of time. However, it was permissible for the district judge to find that there was an intended loss because there was evidence that the conspirators considered and discussed how much money the scheme would produce. For example, in response to a comment by Hussey, Mark Koenig indicated that 1,000 cards could produce $500,000. In light of the language of application note 7 and the evidence of intent, the district judge did not err by basing the section 2F1.1 loss calculation on the intended loss.

We also reject the conspirators' argument that the district judge's factual finding on the amount of the intended loss was clearly erroneous. There was evidence, including statements by some of the conspirators, that justified the district judge's finding that the intended loss was over two million dollars. For example, as stated above, Mark Koenig commented on one occasion that 1,000 ATM cards represented $500,000. Since it appears that the conspirators were attempting to make about 7,470 cards, the intended loss would be approximately 3.74 million dollars. Even if we assume that one-third of the cards were not used, the intended loss would still be greater than two million dollars. Although one statement or calculation may not always conclusively establish that the conspirators intended a loss of over two million dollars, the evidence taken as a whole supports the conclusion that the district judge did not clearly err in calculating the intended loss.

The conspirators argue that the figures are speculative and merely reflect their inflated expectations about the potential success of the conspiracy. However, section 2F1.1 only requires a calculation of "intended loss" and does not require a find-

ing that the intentions were realistic. In addition, the conspirators' characterizations of their calculations as "off the cuff" and "mere guesswork" are contradicted by the evidence. The conspiracy was highly planned, well-organized, and sophisticated. Given the extent of the organization and planning, the district judge did not clearly err in taking the conspirators' plans and loss assessment seriously in calculating the intended loss to be over two million dollars.

The government contends that even if the district court erred in calculating the intended loss, the sentences were also justified as upward departures from the applicable guideline range. We need not reach this issue because we hold that the district court did not err in calculating the intended loss.

### III

■ The conspirators next argue that they are entitled to an offense level adjustment under section 2X1.1(b) of the Sentencing Guidelines, which provides that sentencing judges should reduce the offense level by three points for certain attempts and conspiracies. The conspirators did not raise this issue in the district court; therefore, we review only for plain error. *United States v. Lopez–Cavasos*, 915 F.2d 474, 475 (9th Cir.1990). Because none of the recognized exceptions to the waiver doctrine is applicable here, we only determine whether there was "a highly prejudicial error affecting substantial rights." *Id.* at 476 (internal quotations omitted).

When construing the Sentencing Guidelines, we are required to "consider the guideline and commentary together." *United States v. Anderson*, 942 F.2d 606, 613 (9th Cir.1991) (en banc). The guideline commentary must be given greater weight than "ordinary legislative history, which normally can be ignored if the statute is clear." *Id.* at 611. Whenever possible, the guideline and commentary must be construed "so as to be consistent ... with each other and with the Part as a whole." *Id.* at 613.

■ After considering the Guidelines and commentary, we hold that the relevant

provisions of section 2X1.1 do not apply in this case. Section 2X1.1 is entitled "Attempt, Solicitation, or Conspiracy Not Covered by a Specific Guideline." U.S.S.G. § 2X1.1. Application note 1 also states that "[s]ection 2X1.1 applies only in the absence of a more specific guideline." *Id.* § 2X1.1, comment. (n. 1). Thus, section 2X1.1 does not apply if the offense is covered by a more specific guideline.

Although the text of section 2F1.1 does not specifically state that all conspiracies and attempts to commit fraud are covered by this section, the commentary states that "[o]ffenses involving fraudulent identification documents and access devices, in violation of 18 U.S.C. §§ 1028 and 1029, are ... covered by this guideline." *Id.* § 2F1.1, comment. (n. 12). Moreover, section 1029 expressly covers conspiracies and attempts to commit fraud. *See* 18 U.S.C. § 1029(b)(1), (2). Therefore, section 2X1.1 does not apply because section 2F1.1 applies to the offense in this case.

■ The conspirators contend that this argument ignores relevant portions of the commentary to the Sentencing Guidelines. They point out that application note 7 of the commentary to section 2F1.1 incorporates the commentary to section 2B1.1. U.S.S.G. § 2F1.1, comment. (n. 7). Section 2B1.1, in turn, incorporates the provisions of section 2X1.1. *Id.* § 2B1.1, comment. (n. 2). Following this chain of references, the conspirators argue that the provisions of section 2X1.1 should be applied to section 2F1.1 offenses.

We need not decide whether we should adopt the chain of references argument. The relevant portion of application note 7 to section 2F1.1 states that the "[v]aluation of *loss* is discussed in the Commentary to § 2B1.1." *Id.* § 2F1.1, comment. (n. 7) (emphasis added). Additionally, application note 2 to section 2B1.1 states, in part, that "[i]n cases of partially completed conduct, the *loss* is to be determined in accordance with the provisions of § 2X1.1." *Id.* § 2B1.1, comment. (n. 2) (emphasis added). Thus, the relevant provisions of the commentaries to sections 2F1.1 and 2B1.1 only

address the method for valuing the loss. Even if we assume that the express limitation on the applicability of section 2X1.1 does not bar the incorporation by reference of section 2X1.1, only those provisions of section 2X1.1 that are helpful in valuing the loss are incorporated into the commentary to section 2F1.1.

Only subsection 2X1.1(a), and its applicable commentary, is useful in valuing a loss. Subsection 2X1.1(a) states that the base offense level for an attempt or conspiracy is "[t]he base offense level from the guideline for the object offense, plus any adjustments from such guideline for any intended offense conduct that can be established with reasonable certainty." *Id.* § 2X1.1(a). The principles underlying subsection 2X1.1(a) indicate, for example, that "in the case of the theft of a government check or money order, loss refers to the loss that would have occurred if the check or money order had been cashed." *Id.* § 2B1.1, comment. (n. 2). Therefore, subsection 2X1.1(a) is relevant to the valuation of losses.

The conspirators, however, rely on subsection 2X1.1(b) for their desired three point reduction. Subsection 2X1.1(b) does not address the valuation of losses or provide any principles useful in valuing a loss. Thus, even if we assume, without deciding, that subsection (a) of section 2X1.1 is incorporated into the commentary to section 2F1.1, subsection (b) of section 2X1.1 is not incorporated because it does not address the "[v]aluation of loss." *Id.* § 2F1.1, comment. (n. 7).

Our holding is consistent with *Davis*, in which we merely indicated that the district court properly applied section 2F1.1 and 2X1.1 to determine the probable or intended loss. 922 F.2d at 1391–93. *Davis* did not decide whether a defendant convicted of a conspiracy covered by section 2F1.1 is entitled to a three point reduction under section 2X1.1(b). Any effort to construe language in *Davis* as requiring the application of 2X1.1(b) would be fruitless, since the issue was not before us in that case.

■ Our interpretation, however, is arguably in conflict with a recent amendment to the commentary. The Sentencing Commission has amended the commentary to section 2F1.1 to require specifically that the "offense level" for "partially completed" offenses "be determined in accordance with the provisions of § 2X1.1." U.S.S.G. § 2F1.1, comment. (n. 9) (Nov. 1991). Although the Commission stated that this amendment was intended to provide "a more precise reference" to section 2X1.1, we believe that this amendment amounts to a substantive change in the commentary. *Id.*, Appendix C, para. 393 (Nov. 1991). As discussed above, the plain language of the Guidelines and the relevant commentary in effect at the time of sentencing indicate that section 2X1.1(b) is not incorporated into section 2F1.1. Thus, even assuming that effective November 1, 1991, section 2X1.1(b) may be incorporated into the commentary to section 2F1.1, the Guidelines and commentary in effect at the time of sentencing do not require the application of section 2X1.1(b). *See United States v. Audelo–Sanchez*, 923 F.2d 129, 131 (9th Cir. 1990). For all of these reasons, we conclude there was no error, let alone plain error, in the district court's determination.

## IV

At sentencing, Jacklyn Bobby argued that she was entitled to a downward departure under the Guidelines based on the disparity between the actual loss and the probable or intended loss calculated by the district court. The district judge denied this request, stating that "[t]he downward departure requested does not seem to me to have a basis."

■ The discretionary refusal to grant a downward departure will not be reviewed on appeal. *United States v. Morales*, 898 F.2d 99, 101–03 (9th Cir.1990). Bobby attempts to evade this rule by arguing that the district judge did not exercise her discretion, but instead denied the request for a departure out of the mistaken belief that she did not have the authority to

depart. *See id.* at 102 n. 2. In support, Bobby seizes on the district judge's statement that the departure did not "have a basis."

Read in context, the district judge's remarks do not support Bobby's argument that the district judge believed she lacked the legal authority to depart. When addressing Bobby's request, the district judge stated that:

> The downward departure requested does not seem to me to have a basis. The fact that the actual loss by use of the cards directly was only a couple of hundred dollars is certainly not of her doing. It was because of apprehension before the scheme could be fully implemented, and, in fact, the actual dollar loss therefore considerably understates the seriousness of the offense behavior.

These comments demonstrate that the district judge set the sentence after assessing the facts of the case and Bobby's culpability, and not because she mistakenly believed that she lacked the authority to depart.

■ We also disagree with Bobby's argument that the district judge erred by adjusting Bobby's offense level based on her supervisory role. *See* U.S.S.G. § 3B1.1. We review this issue for clear error. *United States v. Carvajal,* 905 F.2d 1292, 1295 (9th Cir.1990). The district judge based this increase on the fact that Bobby helped recruit at least one other person and played a managerial role in the scheme. The district judge found that Bobby was "at the level of a supervisor in seeing that the cards were manufactured," and observed that Bobby "was involved and involved early on." Although Bobby contests these findings, the evidence is sufficient to conclude that the district judge's role determination was not clearly erroneous.

### V

■ Hussey also contends that he was not a manager or supervisor. The district court increased Hussey's offense level by three points under section 3B1.1, because she found that Hussey was a "manager or supervisor" in the conspiracy. *See* U.S.S.G. § 3B1.1(b). In concluding that Hussey's participation merited an offense level increase, the district judge relied, in part, on Hussey's detailed notes that were "reflective of someone who [was] of a managerial level and very important to the success of the operation."

Hussey argues that he did not qualify as a manager or supervisor because he did not direct other members of the conspiracy. It is true that a role adjustment is warranted only if Hussey exercised "some degree of control or organizational authority over others." *United States v. Mares–Molina,* 913 F.2d 770, 773 (9th Cir.1990); U.S.S.G. § 3B1.1, comment. (n. 3). In this case, however, there is evidence that Hussey played a managerial role in the conspiracy. For example, Hussey concedes that he "took the lead in analyzing the group's most efficient use of manpower." His notes also arguably indicate that he played some role in educating and directing the group. The district judge's finding that Hussey was a manager within the meaning of section 3B1.1 was not clearly erroneous.

### VI

■ The conspirators argue that the expenses claimed by Bank of America were too indirect to be recoverable under the Victim and Witness Protection Act (Act). *See* 18 U.S.C. § 3663. We review the district court's interpretation of the Act de novo (independently). *United States v. Ruffen,* 780 F.2d 1493, 1496 (9th Cir.), *cert. denied,* 479 U.S. 963, 107 S.Ct. 462, 93 L.Ed.2d 407 (1986). However, we review a restitution award within statutory limits only for an abuse of discretion. *United States v. Cloud,* 872 F.2d 846, 855 (9th Cir.), *cert. denied,* 493 U.S. 1002, 110 S.Ct. 561, 107 L.Ed.2d 556 (1989).

■ The Act authorizes courts to order a defendant to pay restitution to "any victim of such offense." 18 U.S.C. § 3663(a).

In this case, the district judge ordered the conspirators to pay restitution to Bank of America for expenses incurred in connection with the bank's reprogramming of the stolen ATM account information.

We have held that the Act permits restitution "only for losses directly resulting from the defendant's offense." *United States v. Kenney,* 789 F.2d 783, 784 (9th Cir.) (internal quotations omitted), *cert. denied,* 479 U.S. 990, 107 S.Ct. 586, 93 L.Ed.2d 588 (1986). For example, there we held that a restitution award to a "bank to pay salaries of employees who testified at trial is not warranted because it was too remote to form the basis for restitution." *Id.* (internal quotations omitted). The conspirators argue that our cases compel a holding that the district judge erred by ordering restitution for the expenses incurred by the bank in notifying customers of the theft, answering customer inquiries and reprogramming stolen accounts.

The district court carefully examined the expenditures claimed by the bank, and excluded some expenses, such as the reward to the informant. The district court concluded that the remaining expenses were "directly caused" by the conspirators' crimes. The restitution ordered by the district court reflects losses to the bank resulting directly from the decoding of the stolen information and the manufacturing of the counterfeit ATM cards. The award did not cover expenses ancillary to the actual loss, such as the salaries of witnesses.

AFFIRMED.