265 F.3d 917 (9th Cir. 2001)
 UNITED STATES OF AMERICA, PLAINTIFF-APPELLEE
v.
GAMMA TECH INDUSTRIES, INC., DEFENDANT-APPELLANT
UNITED STATES OF AMERICA, PLAINTIFF-APPELLEE
v.
MICHAEL J. GALLEGOS; TIDELANDS TESTING, INC., DEFENDANTS-APPELLANTS
UNITED STATES OF AMERICA, PLAINTIFF-APPELLEE
v.
DEAN STANLEY, DEFENDANT-APPELLANT
 Nos. 99-50730, 99-50731, 00-50009
 UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT
 Argued June 6, 2000
Submission Deferred June 7, 2000
Resubmitted December 21, 2000 Pasadena, California
Filed September 12, 2001
 
 [Copyrighted Material Omitted][Copyrighted Material Omitted]
 Howard B. Frank, San Diego, California, for the defendant-appellant Gamma Tech Industries, Inc.
 Timothy K. MacNeil, San Diego, California, for the defendants-appellants Michael J. Gallegos and Tidelands Testing, Inc.
 Gregory D. Obenauer, San Diego, California, for the defendant-appellant Dean Stanley.
 Patrick O'Toole, United States Attorney, George D. Hardy, Assistant United States Attorney, San Diego, California, for plaintiff-appellee United States. Robert D. Rose and Frank J. Polek, San Diego, California, for amicus curiae Pacific Ship Repair & Fabrication, Inc.
 Appeal from the United States District Court for the Southern District of California Rudi M. Brewster, District Judge, Presiding D.C. Nos. CR-96-01930-RMB; CR-96-01929-RMB; CR-96-01928-JH
 Before: Alex Kozinski, Thomas G. Nelson and Kim McLane Wardlaw, Circuit Judges.
 
 Kozinski, Circuit Judge
 
 1
 The district court, as part of its sentence, ordered the defendants to pay restitution totaling close to $1 million. The government did not ask for restitution; in fact, it objected. The district court nevertheless ordered restitution at the behest of a private party who claimed it was damaged by the defendants' criminal misconduct. We consider whether, and subject to what limitations, the district court may order restitution when the government does not initiate the restitution request.
 
 I. FACTS
 
 2
 Defendants were convicted on charges arising out of the payment of kickbacks during the years 1991 to 1994 on contracts involving the maintenance and repair of three United States Navy aircraft carriers based at the North Island Naval Air Station in Coronado, California. Defendant Stanley was, at the time of the crimes, employed by Pacific Ship Repair & Fabrication, Inc. ("Pac Ship"), which had a contract with Navy to perform repairs on the carriers. Stanley, who was responsible for overseeing Pac Ship's contracts with both sub-contractors and Navy, conspired with four subcontractors to receive kickbacks in return for selecting them to perform work on the carriers. Defendants Gamma Tech Industries, Inc. ("Gamma Tech") and Tidelands Testing, Inc. ("Tidelands") were two of these subcontractors.[1] Defendant Michael J. Gallegos was part owner of Gamma Tech and the owner of Tidelands, and paid kickbacks to Stanley on behalf of both companies.
 
 
 3
 The kickbacks Stanley received were generally a fraction of the total payments to the subcontractors, usually 10 percent. Gamma Tech, generally through Gallegos, ultimately paid him approximately $29,000. Gallegos left Gamma Tech and founded a new company, which became Tidelands, and continued to pay kickbacks to Stanley. Tidelands, again through Gallegos, ultimately paid Stanley a total of approximately $170,000 in kickbacks.[2]
 
 
 4
 During the course of the kickback scheme, Pac Ship and Navy operated within an indefinite delivery type contract (IDTC). An IDTC sets a price schedule for repairs Navy may need in the future, detailing these potential repairs as "line items." One IDTC may contain hundreds of line items, including everything from repairing boilers to resurfacing the flight deck. Even though the line items are described and their prices are set in advance, an IDTC is indefinite because the parties don't know what repairs will actually be ordered until the ships return from service. An IDTC creates a fixed-price shopping list for repairs with an indefinite quantity to be ordered, obviating the need for Navy to seek out bids each time a ship requires work.
 
 
 5
 As the prime contractor under the IDTC, Pac Ship attempted to make money by setting the fixed price for the line items high enough to cover its own cost plus a profit margin. Because IDTC fixes the line item prices in advance, any increase in Pac Ship's costs of performing a particular service would necessarily decrease its profit margin on that line item.
 
 
 6
 One wrinkle in the administration of an IDTC is what is known as a modification. A modification occurs when Navy has ordered a particular line item but, in the course of doing the work, the contractor discovers that completion of the item may not be warranted. In such a case, the prime will submit a report recounting what it has found and recommending what should be done instead of finishing the line item repair. These reports often list not only discoveries that will result in more work for the contractor, but also those that will reduce the scope and cost of the work required.
 
 
 7
 Once the report is submitted, both Navy and the prime estimate a cost for the modification, which may be more or less than the cost of the original line item; negotiations follow until the parties agree upon a price. Although modifications are part of the overall IDTC, and therefore not subject to competitive bidding, the price Navy pays for modifications is not fixed in advance, but is determined on a case-by-case basis. A significant portion of the work on the carriers under Pac Ship's IDTC appears to have started out as line items but later became modifications.
 
 
 8
 In completing Navy's job orders, Pac Ship often hired sub-contractors to accomplish different tasks. Gamma Tech and Tidelands were two subs hired to perform what is called non-destructive testing (NDT). There are several NDT techniques, such as X-ray and ultrasonic testing, that are designed to confirm the quality of a particular part or repair without damaging the subject of the test. For example, if Navy requests that a section of pipe be replaced, it may require X-ray examination of welded joints to ensure the new welds are up to standard. NDT is generally not its own line item in an IDTC, nor is it the sole object of a modification. Rather, it is only a sub-part of the job, usually described in Navy's specifications for successful completion of a particular line item or modification.
 
 
 9
 In 1993, Pac Ship received an anonymous tip that Stanley was receiving kickbacks from subcontractors. It conducted an internal investigation, which proved inconclusive. Pursuant to its agreement with the government, Pac Ship also notified Navy, and the Naval Criminal Investigative Services advised Pac Ship that it would be investigating the tip. Pac Ship placed Stanley on administrative leave in late 1994, thus ending the kickback scheme, and fired him soon after.
 
 II. PROCEDURAL HISTORY
 
 10
 Stanley was indicted on 128 counts, including charges of conspiracy to provide and receive kickbacks on Navy contracts, in violation of 18 U.S.C. §§ 371; soliciting and accepting kickbacks on Navy contracts, in violation of 41 U.S.C. §§§§ 53, 54; and filing false income tax returns, in violation of 26 U.S.C. §§ 7206(1). Tidelands and Gallegos pleaded guilty to conspiring to provide and receive kickbacks on Navy contracts, and paying kickbacks on Navy contracts. Tidelands also pleaded guilty to filing false income tax returns. Gamma Tech pleaded guilty to a single count information charging it with the payment of kickbacks on Navy contracts. Stanley ultimately pleaded guilty to conspiracy and filing a false tax return. None of the plea agreements provided for restitution to any victim.
 
 
 11
 The district court held a sentencing hearing for Gamma Tech, Tidelands and Gallegos.[3] After the government and the defendants made their sentencing recommendations, and before the district court pronounced sentence, counsel for Pac Ship asked to be heard as to restitution. Neither the presentence report nor the government had identified Pac Ship as a victim to whom restitution would be appropriate, even though Pac Ship had previously discussed its claims with the government. The district court postponed sentencing in order to allow Pac Ship to file a formal request for restitution.
 
 
 12
 At the subsequent hearing on Pac Ship's restitution request, defendants and the government argued that Pac Ship had no standing to bring its request because only the government and the probation office are permitted to identify victims of a criminal offense and bring requests for restitution on their behalf. The district court rejected this contention, allowed Pac Ship to present evidence of alleged losses it had suffered as a result of the kickback scheme and gave the defendants an opportunity to present their own evidence in response. The subsequent hearings, fourteen in all, involved the presentation of extensive testimonial and documentary evidence, substantially prolonging the sentencing process.
 
 
 13
 At the conclusion of the hearings, and after further briefing, the district court granted Pac Ship's "petition for restitution," issuing an order detailing the amounts of restitution to which Pac Ship was entitled. The government subsequently filed a motion for reconsideration contesting the district court's finding that Pac Ship had constitutional standing to intervene in the case. The district court denied the government's motion; it concluded that, whether or not Pac Ship had standing in the strict sense of the word, the court nonetheless had authority to consider Pac Ship's request. The defendants were then sentenced, and the district court's judgments included the amounts of restitution it had determined in its earlier order. The court ordered Gamma Tech and Gallegos to pay, jointly and severally, $167,231, representing the losses caused by Gamma Tech's payment of kickbacks to Stanley. The court ordered Tidelands and Gallegos to pay, jointly and severally, $423,689.50 for the losses from Tideland's participation in the scheme.[4] The court also ordered Stanley to pay these amounts, jointly and severally with the other defendants, as well as $322,900 for the kickbacks paid by the unindicted subcontractors, for a total of $913,820.50. Defendants all timely appealed the restitution aspect of their sentences.[5]
 
 
 14
 On appeal, we granted Pac Ship leave to appear as amicus curiae to defend the propriety of the district court's restitution orders, as both the defendants and the government advocate reversal of the orders.
 
 III. DISCUSSION
 
 15
 A. PAC SHIP'S "STANDING"
 
 
 16
 Defendants have maintained all along that the district court acted ultra vires in considering Pac Ship's request for restitution because Pac Ship lacks "standing" to intervene as a party in this criminal case. But, as the district court and the government recognize, the issue is not whether Pac Ship had standing to enter this case as a party; it clearly did not.[6] Rather, the question is whether the district court acted within its authority when it permitted Pac Ship to present evidence on the question of whether the court should order restitution, even though Pac Ship is not a party.
 
 
 17
 Congress has provided that "[n]o limitation shall be placed on the information concerning the . . . conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." 18 U.S.C. §§ 3661. This is in keeping with the court's duty to set a sentence that is"sufficient, but not greater than necessary" to achieve the purposes of sentencing. See 18 U.S.C. §§ 3553(a). Thus, the district court has virtually unfettered discretion in allowing affected individuals to present sentencing information to the court. See Roberts v. United States, 445 U.S. 552, 556 (1980) ("Two Terms ago, we reaffirmed the fundamental sentencing principle that a judge may appropriately conduct an inquiry broad in scope, largely unlimited either as to the kind of information he may consider, or the source from which it may come.") (internal quotations omitted).
 
 
 18
 Defendants mistakenly contend that the statutes authorizing the district court to order restitution, 18 U.S.C. §§§§ 3663, 3664 (1994),[7] establish a particular statutory procedure, by which only the government or the probation office may identify victims and request restitution on their behalf. Neither of these sections says what the defendants claim. Section 3663(a)(1), in fact, provides that the district court may order that a defendant make restitution to "any victim" of the defendant's offense. 18 U.S.C. §§ 3663(a)(1) (emphasis added). Section 3664(a) further provides that "[t]he court, in determining whether to order restitution under section 3663 of this title and the amount of such restitution, shall consider the amount of the loss sustained by any victim as a result of the offense." 18 U.S.C. §§ 3664(a) (emphasis added). The statute, by its plain language, gives the district court discretion to identify victims other than those brought to its attention by the government or the probation office.
 
 
 19
 It is true that section 3664(d) puts on the government the burden of proving the amount of loss for purposes of setting restitution, but Congress doubtless based this formulation on the assumption that it is the government who normally advocates on behalf of the victim. The same provision also authorizes the district court to assign the burden"of demonstrating such other matters as the court deems appropriate . . . as justice requires." 18 U.S.C. §§ 3664(d). So long as the district court orders defendants to pay restitution only after someone proves the amount by a preponderance of the evidence, there is no reason a non-party like Pac Ship can't carry the burden. We therefore conclude that section 3664(d) authorizes the district court to allow a victim to prove up its own claim for restitution when the court deems it appropriate to do so. See also United States v. Cloud, 872 F.2d 846, 855 (9th Cir. 1989) ("[T]he victims of the offense should be allowed to participate in the sentencing hearing so that their losses can be accurately determined.").
 
 B. SEPARATION OF POWERS
 
 20
 Defendants (but not the government) argue that allowing a victim to insert itself into a criminal case when the parties have reached a settlement violates the separation of powers by improperly disturbing the executive branch's constitutional authority to conduct criminal prosecutions. It is unclear whether defendants have standing to raise a separation of powers claim when the government has chosen not to do so. Nevertheless, we exercise our discretion to address the claim on the merits.
 
 
 21
 The government's ability to enter into plea agreements with defendants may be undercut somewhat when the ultimate sentence does not coincide with what is in the plea agreement, but this does not raise separation of powers concerns. All plea agreements are uncertain to some extent: The district court, after giving the parties' agreement due consideration, may reject their sentencing recommendations and impose a different sentence altogether, if the plea is one pursuant to Federal Rule of Criminal Procedure 11(e)(1)(B); or it may reject the plea agreement in its entirety under Rule 11(e)(4). The district court has ultimate authority to decide what the sentence should be; the court does not improperly intrude on an executive function when it refuses to follow the terms of a plea agreement. See 18 U.S.C. §§ 3553(a); United States v. Miller, 722 F.2d 562, 564 (9th Cir. 1983) ("In sentencing decisions, the prosecutor's role is purely advisory; in charging decisions, his discretion is almost absolute."); United States v. Savage, 978 F.2d 1136, 1137 (9th Cir. 1992) (under Rule 11,"a trial court retains discretion in rejecting or accepting plea bargains"). Because restitution is an aspect of the sentence, not a charging decision, allowing the government to dictate what evidence the district court may consider concerning the proper amount of restitution would actually constitute executive interference with judicial authority.
 
 C. ABUSE OF DISCRETION
 
 22
 Accepting the proposition that the district court had authority to hear Pac Ship's claim, the government nonetheless contends that the district court abused its discretion under section 3663(d) because the loosely structured restitution hearings significantly delayed imposition of the defendants' sentences. We doubt the district court could ever abuse its discretion by accepting evidence relevant to a sentencing decision, and it certainly did not here. The district court's decision was especially reasonable in light of the fact that the situation it confronted was, if not unheard of, highly unusual. Moreover, once it decided to allow Pac Ship to present its evidence of damages, the district court was bound to conduct a full and fair hearing on the issue of restitution. See United States v. Najjor, 255 F.3d 979, 983-84 (9th Cir. July 2, 2001).[8]
 
 
 23
 D. WAS PAC SHIP A VICTIM?
 
 
 24
 The district court determined that Pac Ship was a victim of defendants' crimes based on two theories: (1) because of the payment of kickbacks and the resulting noncompetitive atmosphere, Gamma Tech and Tidelands were able to overcharge Pac Ship by inflating their fees, causing Pac Ship to lose profits; and (2) the money paid to Stanley as kickbacks belonged to Pac Ship under California law.
 
 1. Lost Profits
 
 25
 We begin with the basic rule that restitution in a criminal case may only compensate a victim for actual losses caused by the defendant's criminal conduct. See 18 U.S.C. §§ 3664(a); United States v. Rodrigues, 229 F.3d 842, 845 (9th Cir. 2000) (restitution may be ordered only "up to the amount actually lost by the victims").
 
 
 26
 The district court determined that Pac Ship was a victim because the payment of kickbacks to Stanley enabled Gamma Tech and Tidelands to overcharge Pac Ship, which reduced Pac Ship's profit margins. This finding has three necessary sub-elements which we must review before we can affirm the district court's finding: (a) the payments to Gamma Tech and Tidelands were intentionally inflated; (b) Pac Ship was not able to pass these inflated costs on to Navy; and (c) Pac Ship's ensuing lost profits "directly resulted " from the payment of the kickbacks.
 
 
 27
 a. Inflated Subcontractor Payments
 
 
 28
 Defendants and the government argue that the district court erred by finding that Gamma Tech and Tidelands intentionally overcharged Pac Ship, but our review of factual findings is highly deferential. See United States v. Lawrence, 189 F.3d 838, 846 (9th Cir. 1999). The record shows that Pac Ship's profit margin shrank drastically during the years of the kickback scheme but promptly returned to its previous level after Stanley was fired, and that Gamma Tech and Tidelands received substantially more money from Pac Ship during the scheme than before and after it. Giving due regard to the district court's credibility determinations, see 18 U.S.C. §§ 3742(e), we cannot say that the court clearly erred in its findings that the subcontractor fees were intentionally inflated, and by how much.
 
 
 29
 b. "Pass-Through"
 
 
 30
 The district court recognized that, if Pac Ship had been able to pass on to Navy the inflated charges from Gamma Tech and Tidelands when negotiating the price of the modifications, Pac Ship would have suffered no loss. Rather, it would have been Navy, and the taxpayers, who were injured.[9] The district court found, however, that Pac Ship did not pass on the inflated fees to Navy through the modifications, and several circumstances support this finding. The most important of these is that Stanley negotiated the modifications himself, and he would have had no incentive to pass on to Navy the inflated subcontractor costs. Stanley, as a general matter, was not overly concerned with advancing Pac Ship's interests. In addition, Navy had its own negotiators and estimators working on the modifications; had Stanley tried to pass on the inflated charges, his quotes would have been much higher than Navy expected, and he would have increased his risk of being discovered.
 
 
 31
 The modification process itself also limited Stanley's ability to pass the inflated costs on to Navy. It is apparent from the record that Navy did not just blindly accept quotes from Stanley, which he would have had to pad by thousands of dollars over the value of the work in order to pass on the inflated subcontractor costs. In fact, Navy worked up its own cost estimates for each modification as its starting point for negotiations and usually paid less than the price quoted by Pac Ship. We cannot say that the district court clearly erred in finding that the inflated fees were not passed on to Navy, but instead came out of Pac Ship's profit margin.
 
 
 32
 c. Direct Result
 
 
 33
 A victim for restitution purposes is a person who has suffered a "loss caused by the specific conduct that is the basis of the offense of conviction." Hughey v. United States, 495 U.S. 411, 413 (1990);[10] see also United States v. Koenig, 952 F.2d 267, 275 (9th Cir. 1991) (restitution is limited to those losses "directly resulting" from the defendant's criminal conduct). Here, all defendants pleaded guilty to paying or receiving kickbacks on Navy contracts or conspiring to do so. The conduct underlying these offenses was the payment or receipt of the kickbacks. The government contends that Pac Ship's losses did not flow directly from the conduct underlying the defendants' offenses because it was Pac Ship's subsequent overpayment to the subcontractors that actually caused the loss. We find the government's reading of Hughey and Koenig too narrow, and conclude that Pac Ship's losses did result directly from the conduct underlying the defendants' offenses.
 
 
 34
 In several cases we have concluded that losses did not result directly from a defendant's criminal conduct, because either there was an unrelated, intervening cause, or the criminal conduct to which a defendant pleaded guilty did not cause the loss. See, e.g., United States v. Meksian, 170 F.3d 1260, 1263 (9th Cir. 1999) (rejecting mere "but for " standard for proving loss and reversing restitution order in fraudulent loan application case because an intervening cause for the erroneous issuance of the loan, an inaccurate environmental report, was not directly related to the offense conduct); United States v. Sablan, 92 F.3d 865, 870 (9th Cir. 1996) (reversing restitution order based on consequential damages, such as expenses arising from meetings with law enforcement officers investigating the crime, because such expenses were not necessary to repair damage caused by defendant's criminal conduct); United States v. Reed, 80 F.3d 1419, 1421 (9th Cir. 1996) (reversing restitution order based on damage to private vehicles occurring during flight from police where the offense of conviction was illegal possession of a firearm by a felon); United States v. Tyler, 767 F.2d 1350, 1351 (9th Cir. 1985) (rejecting restitution award under then 18 U.S.C.§§ 3651 because losses based on depressed market prices were"too remote").
 
 
 35
 However, we have approved restitution awards that included losses at least one step removed from the offense conduct itself. See, e.g., United States v. Rice, 38 F.3d 1536, 1542 (9th Cir. 1994) (upholding, in conspiracy and mail fraud case, restitution based on victim's inability to use entire inventory of parts supplied by defendant because victim could not identify which parts were defective); Koenig , 952 F.2d at 274-75 (upholding, in case involving conspiracy to produce and use counterfeit automated teller machine cards, restitution for the cost of reprogramming bank computers after defendants had stolen ATM account information).
 
 
 36
 It is clear from our cases that the phrase "directly resulting" means that the conduct underlying the offense of conviction must have caused a loss for which a court may order restitution, but the loss cannot be too far removed from that conduct. See also United States v. Vaknin, 112 F.3d 579, 590 (1st Cir. 1997) ("[T]he government must show not only that a particular loss would not have occurred but for the conduct underlying the offense of conviction, but also that the causal nexus between the conduct and the loss is not too attenuated (either factually or temporally)."). Defendant's conduct need not be the sole cause of the loss, but any subsequent action that contributes to the loss, such as an intervening cause, must be directly related to the defendant's conduct. Compare Meksian, 170 F.3d at 1263, and Tyler, 767 F.2d at 1351, with Rice, 38 F.3d at 1542, and Koenig, 952 F.2d at 274-75. The causal chain may not extend so far, in terms of the facts or the time span, as to become unreasonable.
 
 
 37
 The overpayments to Gamma Tech and Tidelands caused Pac Ship's lost profits and were, unlike the intervening causes in Meksian and Tyler, directly related to the payment of the kickbacks. The payment of kickbacks to Stanley ensured that Gamma Tech and Tidelands received work on the carriers without having to compete with other bidders, thereby facilitating the inflated payments. In addition, Stanley's kickbacks were a percentage of the amount ultimately paid to Gamma Tech and Tidelands, so there was a strong incentive for him to inflate the payments in order to receive more money. Finally, as the Eleventh Circuit has recognized, it is not unreasonable to assume that a natural result of paying kickbacks is inflation of the charges in order to make the scheme profitable for the payer of the kickbacks. See United States v. Vaghela, 169 F.3d 729, 736 (11th Cir. 1999). Thus, the causal nexus between the payment of kickbacks to Stanley and Pac Ship's lost profits is not too attenuated.
 
 2. Loss of the Kickbacks
 
 38
 The district court ordered Stanley to pay additional restitution based on the kickbacks totaling $322,900 paid to him by the two unindicted subcontractors.[11] See note 2 supra. The district court's decision was based on a section of the California Labor Code which provides:Everything which an employee acquires by virtue of his employment, except the compensation which is due to him from his employer, belongs to the employer, whether acquired lawfully or unlawfully, or during or after the expiration of the term of his employment.
 
 
 39
 Cal. Lab. Code § 2860. The district court found that, because Stanley deprived Pac Ship of the kickback money which belonged to Pac Ship under California law, Pac Ship suffered a loss in the amount of the kickbacks. Defendants and the government contend that section 2860 is not applicable, and that Pac Ship suffered no loss because the kickbacks were the proceeds of criminal activity.
 
 
 40
 California courts have recognized that, under principles of agency theory, "[u]nless otherwise agreed, an agent who makes a profit in connection with transactions conducted by him on behalf of the principal is under a duty to give such profit to the principal," and that this rule"is applicable although the profit received by the fiduciary is not at the expense of the beneficiary." Bank of Am. Nat'l Trust & Sav. Ass'n v. Ryan, 207 Cal. App. 2d 698, 705-06 (Cal. Ct. App. 1962) (citing, in part, Cal. Labor Code section 2860); see also Savage v. Mayer, 33 Cal. 2d 548, 551 (1949) ("All benefits and advantages acquired by the agent as an outgrowth of the agency, exclusive of the agent's agreed compensation, are deemed to have been acquired for the benefit of the principal, and the principal is entitled to recover such benefits in an appropriate action."). Indeed, we stated long ago in a similar context that "[i]t is a settled principle . .. that a bank officer who receives a bonus or other consideration for procuring a loan of the bank's funds commits a breach of trust, and that the consideration so paid belongs to the bank and may be recovered by it." Fleishhacker v. Blum, 109 F.2d 543, 545-46 (9th Cir. 1940).
 
 
 41
 That the kickbacks constitute the corpus delicti of the conspiracy does not change the fact that Stanley kept money that belonged to Pac Ship. The district court properly sought to remedy this loss by ordering Stanley to reimburse Pac Ship for the kickbacks he received from the unindicted subcontractors. The district court did not err in concluding that Pac Ship was a victim entitled to restitution under 18 U.S.C. §§ 3663.
 
 E. COMPLIANCE WITH RULE 11
 
 42
 At oral argument, and by subsequent order directing the filing of supplemental briefs, we asked the parties to address the district court's apparent failure to comply with Federal Rule of Criminal Procedure 11(c)(1) by failing to advise the defendants that restitution might be part of their sentences, as well as whether the defendants waived any potential Rule 11 challenges to their sentences.
 
 1. Waiver
 
 43
 We do not normally consider issues raised for the first time on appeal. United States v. Vonn, 224 F.3d 1152, 1154 (9th Cir. 2000), cert. granted, 121 S. Ct. 1185 (2001). However, this general rule does not apply here because Rule 11(h)'s "harmless error" provision gives Rule 11 "its own review mechanism, which supersedes the normal waiver rule. " Id. at 1155; Fed. R. Crim. P. 11(h) ("Any variance from the procedures required by this rule which does not affect substantial rights shall be disregarded."). Thus, although the defendants did not point out to the district court any deficiency in the plea colloquies, or seek to withdraw their guilty pleas, they are not precluded from raising a Rule 11 claim on appeal.[12]
 
 
 44
 We also do not normally consider matters on appeal that are not raised in the appellant's opening brief. United States v. Ullah, 976 F.2d 509, 513 (9th Cir. 1992). Although the Rule 11 issue was not mentioned until oral argument, all parties have since discussed and briefed it. We therefore exercise our discretion to review this claim of error because its omission from the opening briefs has prejudiced no one. See id.
 
 
 45
 2. Was there Rule 11 Error?
 
 
 46
 Rule 11(c)(1) requires that the district court inform the defendant, and determine that he understands, that the court may "order the defendant to make restitution to any victim of the offense. . . ." Fed. R. Crim. P. 11(c)(1).[13] Here, it is undisputed that the district court did not inform any of the defendants of the possibility that it would impose an order of restitution as a part of their sentences. Therefore, we must conclude that the district court did not meet this requirement of Rule 11. See United States v. Garfield, 987 F.2d 1424, 1427 (9th Cir. 1993) ("the policy behind Rule 11 demands strict compliance with the letter of the law").
 
 
 47
 3. Was the Error Harmless?
 
 
 48
 We must still determine whether the violation of Rule 11 affected any of the defendants' substantial rights. See Vonn, 224 F.3d at 1155; Fed. R. Crim. P. 11(h).
 
 
 49
 Pac Ship first contends that the district court's failure to advise the defendants about the possibility of restitution did not affect their substantial rights because they knew that restitution might be ordered despite the variance from the requirements of Rule 11. To support this contention, Pac Ship points to a provision in the plea agreements where defendants waived their right "to appeal or collaterally attack the conviction and sentence, including any restitution order. " Pac Ship argues that, because the district court confirmed that the defendants were aware of the waiver provision during the plea colloquies, they must have known that restitution could be imposed upon them, and the variance from Rule 11 was therefore harmless.
 
 
 50
 Vonn held that "we will not go beyond the plea proceeding in considering whether the defendant was aware of his rights." 224 F.3d at 1155. Here, it is undisputed that the district court failed to advise the defendants of the possibility of restitution during the plea colloquies. The district court did not even specifically mention restitution in the discussion of the waiver provision to which Pac Ship refers. It appears that no mention of restitution was made because neither the parties nor the court anticipated that restitution would be ordered.[14] Based on this record, there is insufficient evidence demonstrating that failure to advise the defendants of the possibility of restitution was harmless because they were nevertheless aware of this possibility.
 
 
 51
 Pac Ship also contends that the variance is harmless, to different degrees for each defendant, because the defendants were properly advised of their potential liability for monetary fines. We have previously held that, when the defendant was ultimately ordered to pay restitution in an amount not exceeding the maximum fine of which he was properly advised by the district court, the failure to notify defendant of the possibility of restitution is harmless. United States v. Crawford, 169 F.3d 590, 593 (9th Cir. 1999).
 
 
 52
 Here, the restitution orders imposed on Gamma Tech and Tidelands were for less than the maximum fines of which they were advised. The Rule 11 variance, consequently, was harmless as to these defendants. We therefore affirm the district court's restitution orders as to Gamma Tech and Tidelands.
 
 
 53
 Because the restitution orders of Gallegos and Stanley exceeded their maximum potential fines, the variance is not harmless as to them. We therefore vacate their restitution orders and remand so that the district court may determine how to correct the error or render it harmless. See United States v. Rogers, 984 F.2d 314, 318-19 (9th Cir. 1993) ("it is in keeping with the harmless error provision to permit the sentencing court the opportunity to render its error harmless"). The error would be rendered harmless if the district court resentenced Stanley and Gallegos to an amount of restitution that doesn't exceed the maximum fines of which they were advised, pursuant to Crawford; or, it would be cured if the district court vacated their guilty pleas and allowed them to choose between pleading anew (knowing full-well the amounts of restitution the district court intends to impose), or going to trial.
 
 
 54
 Accordingly, the district court's judgment in:
 
 
 55
 No. 99-50730 is AFFIRMED;
 
 
 56
 No. 99-50731 is AFFIRMED as to appellant Tidelands Testing, Inc., and VACATED and REMANDED as to appellant Michael J. Gallegos;
 
 No. 00-50009 is VACATED and REMANDED.[15]
 
 
 Notes:
 
 
 [1]
 The two remaining subcontractors were not prosecuted.
 
 
 [2]
 The two unindicted subcontractors paid Stanley kickbacks totaling approximately $323,000.
 
 
 [3]
 Stanley, who entered his guilty plea after the other defendants, was not ready for sentencing at that time because his presentence report had not been completed. Despite this initial delay, he participated fully in the restitution hearings and the district court eventually sentenced him more or less contemporaneously with the other defendants.
 
 
 [4]
 The judgment and commitment order for Tidelands erroneously states that Tidelands also was to pay $167,231, jointly and severally with Gamma Tech. This does not conform to the district court's oral pronouncement of sentence, and the district court is therefore directed to correct Tideland's judgment by deleting the $167,231 amount. See United States v. Allen, 157 F.3d 661, 668 (9th Cir. 1998); Fed. R. Crim. P. 36; 28 U.S.C. §§ 2106.
 
 
 [5]
 We have jurisdiction to reach the Rule 11 issue discussed infra, see Section III.E, pages 25-30, despite the waiver of the right to appeal contained in defendants' plea agreements because a failure to comply with Rule 11's requirements casts doubt on the knowing and voluntary nature of the guilty plea and waiver. See United States v. Michlin, 34 F.3d 896, 898 (9th Cir. 1994). We may also address defendants' challenges to their restitution orders despite the waiver. See United States v. Phillips, 174 F.3d 1074, 1076 (9th Cir. 1999) (concluding that even if defendant had voluntarily and knowingly waived his general right to appeal, this waiver would not affect his ability to appeal a violation of the restitution statutes, citing United States v. Broughton-Jones , 71 F.3d 1143 (4th Cir. 1995)).
 
 
 [6]
 Victims have never had standing to appear as parties in criminal cases. See Linda R.S. v. Richard D., 410 U.S. 614, 619 (1973) ("The Court's prior decisions consistently hold that a citizen lacks standing to contest the policies of the prosecuting authority when he himself is neither prosecuted nor threatened with prosecution."). The restitution statutes, though they have recently given more recognition to the interests of crime victims, have done nothing to change this. See United States v. Mindel, 80 F.3d 394, 397-98 (9th Cir. 1996) (Congress did not intend to give victims a private right to sue or to appeal restitution decisions).
 
 
 [7]
 Congress extensively revised the statutes governing restitution in 1996. All references are to the 1994 versions of these statutes, except as otherwise noted, because utilization of the amended statutes may raise ex post facto concerns. See United States v. Baggett, 125 F.3d 1319, 1322 (9th Cir. 1997) (court must use restitution statute in effect at the time of the offense when use of the new statute would run afoul of the Ex Post Facto Clause). Although Gamma Tech was not convicted of an offense specified in 18 U.S.C. §§ 3663(a)(1), which refers only to offenses in Titles 18, 21 and 49 of the U.S. Code, the district court properly imposed restitution as a discretionary condition of Gamma Tech's probation under 18 U.S.C. §§ 3563(b)(3). Such an order is subject to the same statutory requirements of sections 3663 and 3664 as the restitution orders imposed upon Tidelands, Gallegos and Stanley. See 18 U.S.C.§§ 3563(b)(3).
 
 
 [8]
 We need not decide whether the district court is ever required to consider a victim's request to present evidence as to restitution. The statute itself seems to speak in permissive terms. See 18 U.S.C. §§ 3663(d) (providing that if the court "determines that the complication and prolongation of the sentencing process resulting from the fashioning of an order of restitution under this section outweighs the need to provide restitution to any victims, the court may decline to make such an order"). It is unclear whether, if the evidence to be presented will not complicate or prolong the proceedings to a significant degree, the court then has a duty to consider the restitution claim.
 
 
 [9]
 This consideration does not apply to line items that were completed without a modification because in those instances the fixed line item price controlled and Pac Ship could have been forced to absorb the inflated sub-contractor fees.
 
 
 [10]
 The portion of Hughey that limited restitution to those losses caused by the actual offense of conviction was abrogated by the 1990 amendments to section 3663. Section 3663 now provides that if the offense of conviction involves a scheme, conspiracy, or pattern of conduct, restitution may include all losses caused during the course of that scheme, conspiracy or pattern. See 18 U.S.C. §§ 3663(a)(2) (Supp. V 1999). The Hughey rule still applies, however, where the defendant has not been convicted of an offense having a conspiracy, scheme or pattern of conduct as an element. United States v. Lawrence , 189 F.3d 838, 846 (9th Cir. 1999). In addition, even under section 3663(a)(2)'s current expanded definition, a victim must be "directly harmed by the defendant's criminal conduct." 18 U.S.C. §§ 3663(a)(2) (Supp. V 1999). Here, Stanley, Tidelands and Gallegos were convicted of conspiracy, but Gamma Tech was not. Nonetheless, under either the Hughey rule or the amended section 3663, restitution for Pac Ship is only proper if the losses directly resulted from the defendants' criminal conduct.
 
 
 [11]
 The district court ordered all of the defendants to pay restitution based on the amount of the kickbacks. However, this order affected only Stanley's restitution amount because the other defendants' liability under the lost profits theory exceeded the kickback amounts.
 
 
 [12]
 Even though the Supreme Court has granted the government's petition for certiorari, Vonn remains the law of this circuit. The district court on remand may apply any contrary teaching in Vonn if the Supreme Court decides that case while this matter is still pending.
 
 
 [13]
 The Rule qualifies this requirement by stating that the advice must be given "when applicable." Fed. R. Crim. P. 11(c)(1). The fact that restitution is ultimately imposed makes the advisement"applicable" and necessary. Cf. Scott v. Illinois, 440 U.S. 367, 373-74 (1979) (holding that it is the ultimate imposition of incarceration that triggers a defendant's Sixth Amendment right to assistance of counsel at trial).
 
 
 [14]
 We mention what the parties apparently believed because it suggests that defendants may not have anticipated the possibility of restitution when they entered their pleas. We also point out the hazards of omitting Rule 11 advisements based on what the parties and the court predict will happen when the sentence is ultimately imposed.
 
 
 [15]
 The defendants' motion for summary reversal is, obviously, denied.