# In the
# United States Court of Appeals
## For the Seventh Circuit
_____

No. 04-1053

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

WALTER KEVIN SCOTT,

*Defendant-Appellant*.

_____

Appeal from the United States District Court for
the Southern District of Indiana, Indianapolis Division.
Nos. IP 02-142-CR-01-B/F—**Sarah Evans Barker**, *Judge*.

_____

ARGUED FEBRUARY 17, 2005—DECIDED APRIL 25, 2005

_____

Before POSNER, RIPPLE, and MANION, *Circuit Judges*.

POSNER, *Circuit Judge*. Kevin Scott was convicted of bank fraud, of fraudulently using another person's Social Security number, and of transacting in money obtained through crime ("money laundering" in the broad, which is also the statutory, sense). He was sentenced to 120 months in prison and ordered to pay more than $1.3 million in restitution to the victims of his crimes. He appeals on a number of grounds, four of which, all relating to the sentence, have

sufficient substance to warrant discussion. The first is that he received an illegal sentence because the judge thought the sentencing guidelines were mandatory, yet *United States v. Booker*, 125 S. Ct. 738 (2005), held that they are merely advisory. He was sentenced before the *Booker* decision and failed to challenge the mandatory character of the guidelines in the district court; to obtain relief from us he must therefore show that the sentence amounted to a plain error. *United States v. Paladino*, 401 F.3d 471, 481 (7th Cir. 2005). Under the procedure adopted in *Paladino*, if we are uncertain whether the judge would have imposed the same sentence had he (or in this case she) realized that the guidelines are merely advisory, we direct a limited remand for a statement by the judge, *id.* at 483-85; for that is the only way we can determine whether the sentencing error actually harmed the defendant by illegally protracting his term of imprisonment.

As the government points out, it is unlikely that the judge in this case would have given the defendant a lower sentence had she not felt herself bound by the guidelines. She raised the guidelines range one level, from 87-108 months to 97-121 months, by granting an upward departure, and then sentenced the defendant near the top of the elevated range. But as we pointed out in *Paladino*, a sentencing decision by a judge who thinks herself bound by the guidelines will be, if the judge is conscientious, a sentence relative to the guidelines. The judge will compare the defendant with the average offender in the different guideline ranges, without necessarily agreeing that the ranges are correct. Also, with the guidelines merely advisory the judge can take into account mitigating factors that the guidelines ignored, provided that in doing so she is acting "reasonably." *United States v. Booker*, *supra*, 125 S. Ct. at 765; *United States v. Paladino*, *supra*, 401 F.3d at 484. We cannot be sure that

Judge Barker would again sentence Scott to 120 months, now that the guidelines are merely advisory.

But we must decide the other sentencing issues raised by Scott. The Sentencing Reform Act requires resentencing when the challenged sentence was "imposed as a result of an incorrect application of the sentencing guidelines." 18 U.S.C. § 3742(f)(1). This provision survived *Booker*. See 125 S. Ct. at 764. An incorrect application of the guidelines requires resentencing under the post-*Booker* sentencing regime. *United States v. Gleich*, 397 F.3d 608, 615 (8th Cir. 2005).

Pending the disposition of the criminal charges against him, Scott (after a failed suicide attempt) was ordered to reside in a community confinement facility. He was authorized to leave the facility only to consult his lawyer or obtain medical treatment. He repeatedly abused the terms of the leave privilege by falsely claiming that he had an appointment with a psychiatrist, instead using his "medical" leaves not to seek medical treatment but rather to visit his girlfriend and for other purely personal reasons—even to conduct business with another resident of the confinement facility. He also bribed two of the facility's employees to allow him to protract his leaves. For this misconduct while a pretrial detainee Scott was both denied a sentencing discount for acceptance of responsibility and also given a sentence enhancement for obstruction of justice. He challenges the obstruction enhancement.

Had his pretrial antics complicated the prosecution of the fraud charges, he would indeed have been guilty of obstructing justice; but there is no indication of that. The judge said that Scott's antics "got in the way with [she meant 'of'] the proper administration of justice in the course of this case," but what she seems to have meant is that Scott was flouting the court's authority by violating the condi-

tions under which he was being detained. That he was. But he was not, by doing so, making it more costly or otherwise more difficult for the government to prosecute its case against him successfully, as in *United States v. Maccado*, 225 F.3d 766, 772 (D.C. Cir. 2000) (refusal to provide a handwriting sample), and countless other cases (such as our own *United States v. Wells*, 154 F.3d 412, 414-15 (7th Cir. 1998))—which is what "obstruction of justice" means. It is not as if he had been trying to escape, compare U.S.S.G. § 3C1.1, application note 4(e), that is, to elude justice; he never missed, or tried to avoid, a scheduled court appearance. So the enhancement for obstruction of justice was a misapplication of the sentencing guidelines, and Scott is therefore entitled to be resentenced.

He further objects to the fact that his sentence for money laundering was increased because he abused a position of trust. He did abuse a position of trust—he concedes that—but he committed it in the course of his fraudulent schemes to obtain the money that he later laundered, rather than in the course of laundering the money. The relevant guideline provision kicks up the sentence if the defendant abused a position of trust "in a manner that significantly facilitated the commission or concealment of the offense." U.S.S.G. § 3B1.3. Scott did that. To commit the offense of money laundering, he had to commit a crime that would give him money to launder; the abuse of trust facilitated his commission of that crime. *United States v. Young*, 266 F.3d 468, 474-78 (6th Cir. 2001); see also *United States v. Baker*, 227 F.3d 955, 966-67 (7th Cir. 2000); *United States v. Cefaratti*, 221 F.3d 502, 516 (3d Cir. 2000); *United States v. Nicolaou*, 180 F.3d 565, 573-74 (4th Cir. 1999). Had he not abused a position of trust, he might not have obtained any money to launder.

*United States v. Cruz*, 317 F.3d 763 (7th Cir. 2003), is pertinent. The defendant was charged with bank fraud, but

the trust she abused to facilitate her commission of that offense was that of her employer; nevertheless we held that "courts may apply the abuse of trust enhancement even if the defendant did not occupy a position of trust in relation to the victim of the offense of conviction." *Id.* at 766. We have a parallel situation here: Scott abused his employers' trust, but they were not, in any very direct sense at any rate, the "victims" of his money laundering.

Scott also contends that he should not have been required to pay restitution of some $600,000 for audit expenses incurred by the two employers whom he defrauded. After his crimes were discovered, the employers, in an effort to determine how much he had stolen from them, conducted elaborate but not, so far as appears, extravagant audits of their books. The applicable statute, the Mandatory Victims Restitution Act, 18 U.S.C. § 3663A, requires the sentencing court, "in the case of an offense resulting in damage to or loss or destruction of property of a victim of the offense," to order the defendant to return the property to the owner or, if that is infeasible, to pay the owner (the victim) an amount equal to the loss of value of the property. *Id.*, § 3663A(b)(1).

This measure of relief is less generous than common law damages, since it does not extend to consequences beyond the diminution of the value of the property stolen or damaged, *United States v. Seward*, 272 F.3d 831, 839-40 (7th Cir. 2001); *United States v. Simmonds*, 235 F.3d 826, 830-32 (3d Cir. 2000); *United States v. Richard*, 234 F.3d 763, 771 (1st Cir. 2000); *United States v. Mikolajczyk*, 137 F.3d 237, 245-46 (5th Cir. 1998)—consequences that could easily exceed that diminution. (Suppose the damage to the property foreseeably precipitated the owner into bankruptcy.) This distinction is consistent with the historic distinction between restitution and damages, the former originally referring to the restoration of something that the defendant had taken from the

plaintiff, *United States v. Daddato*, 996 F.2d 903, 905 (7th Cir. 1993); *United States v. Fountain*, 768 F.2d 790, 800-01 (7th Cir. 1985); Andrew Kull, "Rationalizing Restitution," 83 *Cal. L. Rev*. 1191, 1192 (1995); Douglas Laycock, "The Scope and Significance of Restitution," 67 *Tex. L. Rev*. 1277, 1279-80 (1989), including a profit. *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 214 n. 2 (2002); *Williams Electronics Games, Inc. v. Garrity*, 366 F.3d 569, 576 (7th Cir. 2004); *United States v. Daddato*, *supra*, 996 F.2d at 905; *United States v. Gordon*, 393 F.3d 1044, 1051-52 (9th Cir. 2004). The audit expense, though a loss to Scott's employers, was not a gain to him. But it was a form of damage to the employers' property. Suppose money was stolen from a bank and eventually returned, but the bank incurred a bookkeeping cost in determining whether the entire amount stolen had been returned. That cost would be a diminution in the value of the bank's property, caused by the theft, and would therefore be a proper item for restitution. See *United States v. Donaby*, 349 F.3d 1046, 1051-54 (7th Cir. 2003); *United States v. Rhodes*, 330 F.3d 949, 953-54 (7th Cir. 2003); *United States v. Hayward*, 359 F.3d 631, 642 (3d Cir. 2004). This case is no different.

Focusing on the difference between the loss to the victim and the damage to the victim's property creates a more precise line between criminal restitution and common law damages than the more common distinction suggested in the cases between "direct" and "consequential" damages. E.g., *United States v. George*, No. 04-3099, 2005 WL 746552, at *3-4 (7th Cir. April 4, 2005); *United States v. Seward*, *supra*, 272 F.3d at 839; *United States v. Barton*, 366 F.3d 1160 (10th Cir. 2004); *United States v. Quillen*, 335 F.3d 219, 222-24 (3d Cir. 2003); cf. *United States v. Lowell*, 256 F.3d 463 (7th Cir. 2001); *United States v. Gamma Tech Industries, Inc.*, 265 F.3d 917, 927-28 (9th Cir. 2001). The line between criminal res-

titution and common law damages is important to maintain. Not only is the language of the Mandatory Victims Restitution Act dissimilar to that of the Uniform Commercial Code, and "restitution" itself no synonym for common law damages. In addition, to blur the line would create a potential issue under the Seventh Amendment because the amount of criminal restitution is determined by the judge, whereas a suit for damages is a suit at law within the amendment's meaning. E.g., *Kelly v. Robinson*, 479 U.S. 36, 53 n. 14 (1986); *Lyndonville Savings Bank & Trust Co. v. Lussier*, 211 F.3d 697, 702 (2d Cir. 2000). And it would complicate criminal sentencing unduly—and unnecessarily; the rare crime victim who has a real shot at collecting common law damages (rare because few convicted criminal defendants are affluent) can bring a tort suit. S. Rep. No. 104-179, 104th Cong., 1st Sess. 18 (1995), 1996 U.S.C.C.A.N. 924, 931.

Not that the distinction between direct and consequential damages is wholly unrelated to the distinction between criminal restitution and common law damages. If *A* tortiously damages *B*'s factory, the cost of repairing the factory is direct damages; *B*'s loss of business while the factory is shut down awaiting repairs is consequential damages. E.g., *Cooper Power Systems, Inc. v. Union Carbide Chemicals & Plastics Co., Inc.*, 123 F.3d 675, 681 (7th Cir. 1997); *Clark's Pork Farms v. Sand Livestock Systems, Inc.*, 563 N.E.2d 1292, 1297-98 (Ind. App. 1990); 1 Dan B. Dobbs, *Law on Remedies* §§ 3.3(3), (4), pp. 298, 302 (2d ed. 1993). The former would be recoverable in a criminal prosecution, the latter not. In our preferred terminology, the first type of damage to the factory impairs the value of *B*'s property; the second injures *B*.

The audit fees are on the damage-to-property side of the line. It is true that most (though not all) cases classify attorneys' fees incurred by a crime victim, which might appear to be the same kind of expense as audit fees, as "con-

sequential damages" that are therefore ineligible for crimi-
nal restitution. *United States v. Seward, supra*, 272 F.3d at 839;
*United States v. Arvanitis*, 902 F.2d 489, 497 (7th Cir. 1990);
*United States v. Onyiego*, 286 F.3d 249, 256 (5th Cir. 2002);
*United States v. Patty*, 992 F.2d 1045, 1049 (10th Cir. 1993);
*United States v. Mullins*, 971 F.2d 1138, 1146-48 (4th Cir.
1992); but see *United States v. Akbani*, 151 F.3d 774 (8th Cir.
1998). (The issue was left open in *United States v. Richard,
supra*.) But this just illustrates the unhelpfulness of the
"direct-consequential" distinction as a guide to interpreting
the criminal restitution statutes. The real reason for denying
an award of attorneys' fees under these statutes is that
attorneys' fees are not classified as damages; the decision to
award or (the traditional Anglo-American rule) not to
award them is a matter of procedural rather than remedial
law. *Zapata Hermanos Sucesores, S.A. v. Hearthside Baking Co.*,
313 F.3d 385, 388-89 (7th Cir. 2002); *Midwest Grain Products
of Illinois, Inc. v. Productization, Inc.*, 228 F.3d 784, 792 (7th
Cir. 2000). Consistent with this analysis, *United States v.
Mikolajczyk, supra*, 137 F.3d at 245-46, allowed an award of
attorneys' fees as restitution because "Kearns's [the defen-
dant's co-conspirator] action of bringing a lawsuit against
Ford was part of the scheme to defraud [Ford], the offense
that is the basis of Koehler's conspiracy conviction" and so
"Ford's costs of defending the lawsuit were a direct and
mandatory result of Kearns's act in furtherance of the
conspiracy, not a voluntary action taken by Ford to recover
property or damages from Kearns, Koehler, or a third
party." The lawsuit was an effort to wrest property from the
victim, and the victim's legal expenses were a measure of
the diminution in the value of that property brought about
by the fraud.

   To summarize, the conviction and the award of restitution are affirmed, but the judgment is vacated and the case remanded for resentencing.


A true Copy:

        Teste:


                          _____
                          *Clerk of the United States Court of*
                          *Appeals for the Seventh Circuit*