# In the
# United States Court of Appeals
## For the Seventh Circuit

———————

No. 03-3332

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

LLOYD J. BARETZ,

*Defendant-Appellant.*

———————

Appeal from the United States District Court for
the Northern District of Illinois, Eastern Division.
No. 03 CR 206-1—**Suzanne B. Conlon**, *Judge.*

———————

ARGUED JUNE 7, 2004—DECIDED JUNE 21, 2005

———————

Before POSNER, RIPPLE and ROVNER, *Circuit Judges.*

RIPPLE, *Circuit Judge.* Lloyd J. Baretz was charged in a
twenty-two-count indictment and pleaded guilty, in ac-
cordance with a plea agreement, to three counts of wire
fraud, in violation of 18 U.S.C. § 1343, and to one count of
conspiracy to commit money laundering, in violation of 18
U.S.C. § 1956(h). The district court, applying the 1997
version of the United States Sentencing Guidelines ("1997
Guidelines"), sentenced him to 151 months in prison on the
conspiracy count and to 60 months in prison on each count
of wire fraud; these sentences were to run concurrently. Mr.

Baretz appeals his sentence. We held this case in abeyance pending the decision of the Supreme Court of the United States in *United States v. Booker*, 125 S. Ct. 738 (2005), and we then invited the parties to file supplemental memoranda presenting their views on the application of *Booker* to this case. For the reasons set forth in the following opinion, we now vacate the sentence and remand for further proceedings consistent with this opinion.

# I

# BACKGROUND

## A. Facts

The wire fraud scheme to which Mr. Baretz pleaded guilty involved the sale of telephone-call accounts receivable to the Royal Bank Export and Finance Corporation ("REFCO"). Mr. Baretz was the president and principal shareholder of Oxford Capital Corporation ("Oxford") and the president of Plymouth Capital Corporation ("Plymouth"). Both of these corporations were engaged in the business of factoring accounts receivable. Factoring is the purchase of a company's invoices at a discount.

The scheme at issue here involved the factoring of telephone-call receivables. A telephone-call receivable is the debt created when an individual places a telephone call to receive certain information at a price (such as a call to a 1-900 number) and agrees to pay for the receipt of that information at a later date. The debt created by this transaction is an account receivable to the Information Provider ("IP"), the company that provided the information in the call.

Integretel Inc. ("Integretel") was a corporation engaged in the business of servicing and purchasing telephone-call

receivables. Integretel serviced IPs by sorting their records and collecting the receivables from each caller's telephone company. Integretel then would remit the collected revenue, minus a service fee, to the IP. Integretel also offered its customers an "early pay" program. Under this program, Integretel would purchase, at a discount, the telephone-call receivables from the IP. This arrangement allowed the IP to receive revenue immediately rather than wait for the debt to be collected.

Integretel had a contract with Plymouth, one of Mr. Baretz' companies. This arrangement was called a master factoring agreement. Under this agreement, Plymouth would purchase, at a discount, specific telephone-call receivables from Integretel. Plymouth thus assumed actual ownership of those receivables. In order to finance its purchase of receivables from Integretel, Plymouth had a further agreement with REFCO, under which REFCO would purchase, at a discount, from Plymouth the receivables that Plymouth had purchased earlier from Integretel.

Under this agreement, there were limitations with respect to the receivables purchased by REFCO. REFCO would purchase only certain identified receivables from Plymouth. The agreement also limited, by dollar amount, the receivables that REFCO would purchase from any one telephone company. The contract also capped REFCO's outstanding balance to Plymouth at any one time at $75 million. Plymouth warranted to REFCO that it had good title, free of encumbrances, to all of the receivables that it sold to REFCO. REFCO had the right to compel Plymouth to repurchase any telephone-call receivable that remained unpaid after 90, and later, 120 days.

Oxford, Mr. Baretz' other company, acted as Plymouth's agent in purchasing telephone-call receivables from Integretel, assigning them to telephone companies for col-

lection and selling them to REFCO. Periodically, Oxford would fax to REFCO an "advance request," which listed the receivables to be purchased by REFCO, the outstanding balance on receivables already sold to REFCO, and the number of months those receivables had been outstanding. Based on the advance request, REFCO would wire payment to Oxford's bank account for the purchase of the agreed upon receivables. Oxford then would deduct its fee and wire the balance to Integretel's bank account.

In December 1995, Mr. Baretz caused Plymouth/Oxford to begin submitting to REFCO fraudulent or wholly fictitious advance requests. In some cases, if Plymouth had purchased receivables from Integretel that exceeded REFCO's agreed limits from a specific telephone company, Plymouth would substitute a false receivable for another telephone company. In other cases, Plymouth simply submitted fictitious receivables. Generally, Mr. Baretz misappropriated the excess funds paid by REFCO but not used to offset Plymouth's payments to Integretel for personal and other business uses. From August 1997 until April 1998, when the fraud scheme was discovered, Plymouth/Oxford stopped purchasing accounts receivable from Integretel and sold only fictitious receivables to REFCO.

In order to fund and conceal his fraud, Mr. Baretz engaged in "weekend sweeps." To run these sweeps, at the end of each week Oxford would borrow money from Integretel (which, unknown to REFCO, Mr. Baretz owned as of January 1996) and forward that money to REFCO. The funds thus remitted to REFCO were represented to be payments on genuine receivables. This misrepresentation concealed that REFCO previously had been sold fictitious receivables that could not generate receipts. In addition, the weekend sweeps funds were identified to REFCO as payments on older receivables that Mr. Baretz wanted to

retire. This scheme avoided REFCO's right to compel Plymouth to repurchase receivables that remained unpaid for more than 120 days.

At the same time, in order to keep REFCO's investment at approximately $75 million, Plymouth/Oxford would send an advance request to REFCO for further purchases. This resulting cash infusion allowed Plymouth/Oxford to repay, early the following week, the loan received from Integretel and gave Mr. Baretz funds with which to make personal expenditures and to pay other outstanding debts.

The extent of this deception was grand: Plymouth/ Oxford never owned more than $25 million in early-pay receivables from Integretel; yet, Plymouth/Oxford had a receivables balance with REFCO of $75 million. The Government submits, and Mr. Baretz has not disputed, that, over the course of this scheme, he and his co-defendants submitted to REFCO more than $400 million in fictitious receivables for purchase. The sweep transactions from Integretel to Plymouth/Oxford involved more than $290 million.

## B. District Court Proceedings

Because it is central to the contentions of the parties on appeal, we shall set forth in some detail the methodology employed by the district court in sentencing Mr. Baretz.

### 1.

The presentence investigation report ("PSR") calculated Mr. Baretz' recommended sentence for the wire fraud counts as follows. The probation officer applied the 1997 Guidelines, the version of the guidelines in effect at the time of the offense. The probation officer used this version rather than the version in effect at the time of sentencing to avoid

what she perceived to be a violation of the Ex Post Facto Clause. *See* U.S.S.G. § 1B1.11(b). In her view, the 1997 version of the guidelines was more beneficial to Mr. Baretz. In applying the guidelines, the officer grouped Counts One, Four and Seven because the offense level for each largely was determined by the total amount of loss. The base offense level was 6 under § 2F1.1.

Section 2F1.1(b) directed that, if the fraud loss amount exceeded $2,000, the offense level should be increased according to the loss table in that section. Turning to the loss table, the probation officer first determined that REFCO had forwarded $75 million to Plymouth/Oxford for the purchase of telephone-call receivables. The officer then subtracted from this figure $21 million that REFCO had recovered from the sale of collateral pledged by Mr. Baretz.

Mr. Baretz disputed this calculation; he submitted that REFCO's loss was collateralized in full; therefore the fraud loss amount was $0. Specifically, he urged that, at the time the fraud was discovered, REFCO had a perfected security interest in the billed and unbilled accounts receivables to be paid by the telephone companies and that this collateral adequately covered all of REFCO's financial exposure. *See* U.S.S.G. § 2F1.1, application note 7(b) (instructing that, if the defendant fraudulently obtained a loan by misrepresenting the value of his assets, the loss equals the amount of the loan not repaid at the time the offense is discovered, reduced by the amount the lending institution has recovered, or can expect to recover, from any asset pledged to secure the loan). The probation officer, however, recommended that none of this collateral reduce the loss amount, because REFCO had not been able to liquidate these receivables and had not received any of the purported assets to reduce the amount owed.

The probation officer also identified another factor relevant to sentencing—relevant conduct. Based on information submitted by the Government, the probation officer noted that Mr. Baretz had committed fraud against other banks. *See* U.S.S.G. § 1B1.3. Mr. Baretz contended, however, that these alleged frauds were not relevant conduct because they were neither part of a common scheme to defraud nor part of the same course of conduct as the offense involving REFCO. The probation officer recommended holding Mr. Baretz responsible for $23.9 million in loss to the other banks. Adding this figure to the $54 million in loss to REFCO, the total recommended fraud loss amount was $77.9 million, which called for a 17-level upward adjustment under § 2F1.1(b)(1)(R).

The probation officer also suggested a 2-level enhancement for "more than minimal planning," in accordance with § 2F1.1(b)(2), and another 2-level enhancement because REFCO was a financial institution within the meaning of § 2F1.1(b)(6)(B).

The district court rejected Mr. Baretz' collateral offset objection to the amount of fraud loss calculated in the PSR; it reasoned:

> [A]t the time the fraud was discovered, it has certainly not been shown that the bank had any invested collateral rights in the receivables, particularly unidentified non-early pay receivables. Sure, they might have had a far-stretched claim under [*In re Telesphere Communications, Inc.*, 167 B.R. 495 (Bkrtcy. 1994), *rev'd*, 205 B.R. 535 (N.D.Ill. 1997)]. That isn't a vested collateral right. That would have been a dubious right. In any case, it would have probably taken a lawsuit which would probably still be going on if that was the course that the bank had decided or REFCO had decided to follow.

> I have reviewed a letter that was submitted to the probation office on behalf of the bank. And it appears to me that the bank reasonably relied on advice of counsel in not pursuing an arguable Telesphere remedy. And that it's the bank's recourse to these receivables is, at best, questionable. And then, as I said, if the bank had decided to exercise some claim or pursue some claim against receivables which, arguably, Integretel owned, although it's not beyond a doubt, or that Plymouth had recourse to, that litigation would have certainly gone on after exposure of the fraud. And what remains unchallenged is, at the time the scheme was exposed, there were no receivables to support the fraudulent sales to REFCO. At least it hasn't appeared to me to be such.

R.106-1 at 49-50. The district court expressly found that the $54 million in loss to REFCO was established by a preponderance of the evidence. With respect to the $23.9 million in loss to the other banks, the district court stated that "it is relevant conduct. And so the presentence report accurately and sufficiently attributes the loss as resulting in a 17 level increase." *Id.* at 51.

In addition, the district court ruled that REFCO was not a financial institution and that, consequently, a 2-level enhancement under § 2F1.1(b)(6)(B) was not appropriate. The court further enhanced Mr. Baretz' offense level by 2 levels under § 3B1.1(c), based on its finding that he was an organizer or leader of the offense. The final adjusted offense level for the wire fraud offenses was 27.

**2.**

With respect to the money laundering offense (Count 22), the probation officer concluded that the base offense level was 23. *See* U.S.S.G. § 2S1.1(a). The adjusted offense level

largely was determined by the value of funds laundered by Mr. Baretz. *See id.* § 2S1.1(b)(2) (instructing that if the value of the funds exceeded $100,000, the offense level should be increased according to the value table). The probation officer estimated that Mr. Baretz had laundered more than $289 million using his system of weekend sweeps.

Neither of the parties believed that the full credit line ought to be the measure of the loss. The Government suggested that the amount of loss due to the fraud, $54 million, might be a better indicator of the value of funds laundered because REFCO's exposure to loss never had been more than $75 million and because much of the money had been cycled through the system several times. Mr. Baretz argued that it was erroneous to conclude that he had intended to launder the full amount of the credit line. He contended that, although REFCO was misled about the source of the funds it received through the weekend sweeps, the sweeps had paid down the loan portfolio by the same amount as the amount of the payments from the local telephone companies. Despite the position of both parties that the full credit line was not the appropriate measure of the loss, the probation officer nevertheless recommended $75 million as the value of funds laundered because this amount was REFCO's maximum exposure at any given time. Based on the $75 million value of funds calculation, the probation officer recommended a 12-level enhancement. *See id.* § 2S1.1(b)(2)(M).

The district court acknowledged, early into the hearing, that Mr. Baretz had objected to the PSR's recommended value of the funds laundered. Nevertheless, the court never made a specific ruling as to the accuracy of this finding. The district court accepted the probation officer's calculation that the offense level was 37; implicitly, therefore, the district court accepted that the value of funds was

$75 million. We do not know, however, why the court rejected the view of the Government and the view of the defendant.

Under § 3D1.2(c), all of the counts of conviction (the wire fraud counts and the money laundering count) were grouped together. The offense level applicable to this group was the offense level for the most serious of the counts, which was the money laundering offense. *See id.* § 3D1.3(a). Thus, the adjusted offense level was 37. The district court then reduced this offense level by 3 points based on its finding that Mr. Baretz had accepted responsibility for purposes of § 3E1.1. The total offense level was 34, which resulted in a sentencing range of 151 to 188 months.

### 3.

Mr. Baretz also requested a downward departure. After calculating Mr. Baretz' total offense level, the district court stated to defense counsel: "Now you had a position for downward departure. Don't you know those don't exist anymore except in cooperation agreements? But go ahead." R.106-1 at 69. Defense counsel then presented his argument; Mr. Baretz spoke in allocution; and the Government presented its contrary argument. Without expressly ruling on the motion, the district court said, "All, right, is there any reason why sentence cannot be imposed at this time," and it proceeded to impose sentence. *Id.* at 82.

The district court sentenced Mr. Baretz to 151 months in prison. In imposing this sentence, the court expressed that the sentence "is more than adequate. I think it's, frankly, high, but it's the lowest sentence mandated by the guidelines considering all the factors that apply to this case. So I'll impose sentence at the bottom end of the guideline range . . . ." *Id.* at 83.

## II

## DISCUSSION

### A. Version of the Guidelines Applied

Mr. Baretz contends that the district court erred by applying the wrong version of the guidelines. Although, in light of the Supreme Court's decision in *Booker*, the guidelines no longer are mandatory, a sentencing court still "must consult those Guidelines and take them into account when sentencing." *Booker*, 125 S. Ct. at 767. As this court recently has articulated, the provision of the Sentencing Reform Act that mandates resentencing when the challenged sentence resulted from an " 'incorrect application of the sentencing guidelines,' " 18 U.S.C. § 3742(f)(1), remains in effect after *Booker*. *United States v. Scott*, 405 F.3d 615, 617 (7th Cir. 2005). "An incorrect application of the guidelines [therefore] requires resentencing under the post-*Booker* sentencing regime." *Id.* (citing *United States v. Gleich*, 397 F.3d 608, 615 (8th Cir. 2005)); *see also United States v. Skoczen,* 405 F.3d 537, 549 (7th Cir. 2005) ("Even under an advisory regime, if a district court makes a mistake in calculations under the Guidelines, its judgment about a reasonable sentence would presumably be affected by that error and thus (putting aside the implications of plain error review) remand would be required just as before."); *United States v. Davis*, 397 F.3d 340, 346 (6th Cir. 2005) ("We read *Booker* to require that when district courts consult the Guidelines, they are to continue to consider the sentence, sentencing range, and pertinent policy statements contained in those Guidelines, as required by § 3553(a)(4) and (5)."). Consequently, if the district court erred in its choice of the applicable guidelines, its choice is still very important in this post-*Booker* era.

Sentencing courts must apply the guidelines in effect on the date the defendant is sentenced, unless the court deter-

mines that doing so would violate the Ex Post Facto Clause of the Constitution of the United States. *See* 28 U.S.C. § 3553(a)(4) & (5);[1]  U.S.S.G. § 1B1.11;[2] *see also United States*

---

[1]  Section 3553(a) provides in relevant part:

(a) Factors to be considered in imposing a sentence.—The court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection.  The court, in determining the particular sentence to be imposed, shall consider—

. . . .

(4) the kinds of sentence and the sentencing range established for—

(A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines—

(i) issued by the Sentencing Commission pursuant to section 994(a)(1) of title 28, United States Code, subject to any amendments made to such guidelines by act of Congress (regardless of whether such amendments have yet to be incorporated by the Sentencing Commission into amendments issued under section 994(p) of title 28); and

(ii) that, except as provided in section 3742(g), are in effect on the date the defendant is sentenced;

. . . .

(5) any pertinent policy statement—

(A) issued by the Sentencing Commission pursuant to section 994(a)(2) of title 28, United States Code, subject to any amendments made to such policy

(continued...)

*v. Lanas*, 324 F.3d 894, 904 (7th Cir. 2003) (noting that court erred by using an earlier version of the guidelines rather than the version in effect at time of sentencing). Mr. Baretz was sentenced on August 19, 2003. The operative version of the guidelines at that time was the 2002 Guidelines, *together with* its supplement issued on April 30, 2003 (the "amended 2002 Guidelines").[3] Instead, the district court applied the

---

[1] (...continued)

> statement by act of Congress (regardless of whether such amendments have yet to be incorporated by the Sentencing Commission into amendments issued under section 994(p) of title 28); and

> (B) that, except as provided in section 3742(g), is in effect on the date the defendant is sentenced.

28 U.S.C. § 3553(a).

[2] Section 1B1.11 provides in part:

> (a) The court shall use the Guidelines Manual in effect on the date that the defendant is sentenced.

> (b)(1) If the court determines that use of the Guidelines Manual in effect on the date that the defendant is sentenced would violate the ex post facto clause of the United States Constitution, the court shall use the Guidelines Manual in effect on the date that the offense of conviction was committed.

U.S.S.G. § 1B1.11.

[3] Mr. Baretz appears to maintain that the district court should have applied the 2002 Guidelines without the April 2003 amendments. *See* Reply Br. at 8. We cannot accept this view in light of this circuit's (and many other circuits') rule that sentencing calculations must be made using a single guidelines manual in its entirety, rather than allowing a defendant to pick and choose

(continued...)

1997 Guidelines (the operative version at the time of the offense) based on the probation officer's conclusion that the earlier version was more beneficial to Mr. Baretz.

### 1.

At the beginning of our analysis, we must determine whether Mr. Baretz waived this challenge to his sentence and therefore cannot raise the matter before us on appeal. "Waiver occurs when a defendant intentionally relinquishes a known right." *United States v. Staples*, 202 F.3d 992, 995 (7th Cir. 2000). Such a deliberate act on the part of the defendant "extinguishes the error and precludes appellate review." *Id.* By contrast, a defendant "forfeits his rights by failing to assert them in a timely manner." *Id.* When a simple forfeiture, as opposed to a waiver, occurs, we may review for plain error. *Id.*

The record in this case will not support the conclusion that Mr. Baretz knew of his right to be sentenced under the 2002 version of the guidelines—the version in effect at the time of sentencing—or knew that the application of the 2002 Guidelines well might yield a lower sentence than the 1997 Guidelines. Indeed, Mr. Baretz garnered no advantage by accepting the use of the 1997 version; the only apparent explanation for its application is that Mr. Baretz and his counsel did not realize that using the expired version was incorrect. Because the record does not evidence a knowing abandonment, we shall review the district court's use of the

---

[3] (...continued)
from favorable provisions contained in various versions of the guidelines. *See United States v. Anderson*, 61 F.3d 1290, 1301 (7th Cir. 1995).

1997 Guidelines for plain error. *See United States v. Hall*, 212 F.3d 1016, 1022 (7th Cir. 2000) (applying plain error review to defendant's assertion, raised for the first time on appeal, that sentence imposed under guidelines in effect at time of sentencing, not at time of offense, violated the ex post facto prohibition).

### 2.

The plain error standard allows us to "correct an error that the defendant failed to raise below only when there was (1) error, (2) that is plain, and (3) that affects substantial rights." *United States v. Henningsen*, 402 F.3d 748, 750 (7th Cir. 2005) (citing *United States v. Olano*, 507 U.S. 725, 732 (1993)); *see also* Fed. R. Crim. P. 52(b). "If these conditions are met, an appellate court may exercise its discretion to notice a forfeited error if (4) the error seriously affects the fairness, integrity, or public reputation of the proceedings." *Id.* (citing *Olano*, 507 U.S. at 732).

The Government concedes that the 1997 Guidelines "was not more favorable than the version in effect at the time of sentencing." Appellee's Br. at 28. A comparison of Mr. Baretz' potential sentence under the amended 2002 Guidelines to the sentence he received under the 1997 Guidelines reveals that the Government is correct.

As we already have noted, due to the multiple-count adjustment under § 3D1.3(a), Mr. Baretz' total offense level was the offense level for his money laundering offense. After the 1997 Guidelines were published and before Mr. Baretz' sentencing, the entire method for calculating the offense level for money laundering offenses was altered. In particular, instead of specifying a base offense level of 23 or 20 depending upon the statute of conviction, § 2S1.1(a) now

ties the base offense level to the offense level for the under-lying offense from which the laundered funds were ob-tained.[4]

The parties in this case agree that the offense level for Mr. Baretz' underlying fraud offenses would be 30.[5] This results from a base offense level of 6, *see* U.S.S.G. § 2B1.1(a) (Supp. 2003), and a 24-level enhancement based on the district court's finding of loss exceeding $50 million, *see id.* § 2B1.1(b)(1)(M) (Supp. 2003). Accordingly, the base offense level for the money laundering offense also would be 30. *See id.* § 2S1.1(a) (2002).

The parties also agree that 2 offense levels would be added because Mr. Baretz was convicted under 18 U.S.C. § 1956, *see id.* § 2S1.1(b)(2)(B) (2002), and that 2 more levels would be added based on the district court's finding of his role in the offense, *see id.* § 3B1.1(c) (2002). The adjusted offense level at this point would be 34.

The parties dispute the remaining calculations. The Government submits that another 2 levels would be added

---

[4] Section 2S1.1(a) provides in part:

(a) Base Offense Level:

(1) The offense level for the underlying offense from which the laundered funds were derived, if (A) the defendant committed the underlying offense (or would be accountable for the underlying offense under subsec-tion (a)(1)(A) of § 1B1.3 (Relevant Conduct); and (B) the offense level for that offense can be determined . . . .

U.S.S.G. § 2S1.1(a) (2002).

[5] Although Mr. Baretz disputes the district court's findings with respect to the fraud loss amount and relevant conduct, he ap-parently accepts those findings for purposes of arguing that the district court erred by applying the 1997 Guidelines.

because the record establishes that the offense involved "sophisticated laundering" within the meaning of § 2S1.1(b)(3) (2002). The Government further submits that Mr. Baretz would be entitled only to a 2-level reduction for acceptance of responsibility, as opposed to the 3 levels awarded by the district court under the 1997 Guidelines. The Government points to a change in the operation of the acceptance of responsibility guideline, § 3E1.1, imple-mented by the 2003 supplement. Unlike prior versions of § 3E1.1, the amendment permits a district court to award a defendant a third point for acceptance of responsibility only upon a formal motion by the Government. *See id.* § 3E1.1(b) (Supp. 2003).[6] The Government asserts that Mr. Baretz would receive only a 2-point decrease because it "never moved or otherwise agreed" that he was entitled to a third point for acceptance of responsibility. Appellee's Br. at 30. The total offense level calculated by the Government would be 34, which results in a sentencing range of 151 to 188 months—the same range calculated by the district court under the 1997 Guidelines.

---

[6] Amended § 3E1.1 provides:

(a) If the defendant clearly demonstrates acceptance of responsibility for his offense, decrease the offense level by 2 levels.

(b) If the defendant qualifies for a decrease under subsection (a), the offense level determined prior to the operation of subsection (a) is level 16 or greater, and upon motion of the government stating that the defendant has assisted authori-ties in the investigation or prosecution of his own miscon-duct by timely notifying authorities of his intention to enter a plea of guilty, thereby permitting the government to avoid preparing for trial and permitting the government and the court to allocate their resources efficiently, decrease the offense level by 1 additional level.

U.S.S.G. § 3E1.1 (Supp. 2003).

Mr. Baretz takes another view of how the district court would calculate his sentence. He submits that we cannot assume that he would receive a sophisticated laundering enhancement because the applicable guideline requires a finding of fact by the district court. He also maintains that the Government cannot fairly claim that he would not be entitled to a full reduction for acceptance of responsibility based on the absence of a formal motion, when such a motion was not required and, thus, was not contemplated by either party. Mr. Baretz calculates his total offense level under the amended 2002 Guidelines as 31, which would yield a sentencing range of 108 to 135 months; a marked difference from the 151 months' sentence he received under the 1997 Guidelines.

We must conclude that the district court erred in its conclusion that Mr. Baretz would receive a more severe sentence under the amended 2002 Guidelines and that, therefore, ex post facto concerns required that the court employ the 1997 Guidelines. Furthermore, this error is plain. *See Olano*, 507 U.S. at 734 (" 'Plain' is synonymous with 'clear' or, equivalently, 'obvious.' ").

Under our pre-*Booker* jurisprudence, the application of the wrong guidelines constituted plain error and required a remand for resentencing.[7] The same approach is required by

---

[7] *See, e.g., United States v. Hall*, 212 F.3d 1016, 1022 (7th Cir. 2000) (" '[A] sentence based on an incorrect guideline range constitutes an error affecting substantial rights and can thus constitute plain error.' " (quoting *United States v. Robinson*, 20 F.3d 270, 273 (7th Cir. 1994)); *United States v. Seacott*, 15 F.3d 1380, 1386 (7th Cir. 1994) (finding plain error from application of guidelines in effect at sentencing when sentence imposed potentially was three months longer than if the court had applied guidelines in effect at time of the offense); *United States v. Kopshever*, 6 F.3d 1218, 1223

(continued...)

our post-*Booker* cases; in those cases, we have said that obedience to the Supreme Court's mandate in *Booker* requires that the district court first calculate the correct guideline sentence so that that calculation can serve as a meaningful guide in the district court's imposition of a final sentence.[8]

We cannot say, at this stage of the proceedings, that the error was harmless. The district court has not made the requisite factual findings to permit us to make that determination.

### B. Downward Departure

We must also conclude that, as far as the record now before us reveals, the district court also erred in articulating that it did not have discretion to depart downward under the guidelines in this case.

We do not have appellate jurisdiction to review a court's discretionary refusal to depart downward. *United States v. Larkins*, 83 F.3d 162, 168 (7th Cir. 1996). We presume, moreover, that a district court understood its authority to depart downward and simply decided not to do so; the defendant has the burden to demonstrate otherwise. *Id.* If the record reflects, however, that the district court thought it had no authority to depart from the guidelines, its refusal to depart is a legal conclusion that is subject to appellate review. *Id.*

---

[7] (...continued)
(7th Cir. 1993) (remanding ex post facto issue involving application of amended guidelines "so that it can be decided on a fully developed factual record").

[8] *See, e.g., United States v. Scott*, 405 F.3d 615, 617 (7th Cir. 2005); *United States v. Skoczen*, 405 F.3d 537, 549 (7th Cir. 2005).

In response to Mr. Baretz' motion for a downward departure, the district court asked "[d]on't you know those don't exist anymore except in cooperation agreements?" R.106-1 at 69. It is possible, as the Government suggests, that the district court's comment that downward departures no longer were available was simply a critical reference to the newly enacted Prosecutorial Remedies and Tools Against the Exploitation of Children Today Act of 2003 (PROTECT Act), Pub. L. No. 108-21, 117 Stat. 650 (2003), or otherwise was said in jest. We must confine our review, however, to the cold record—a medium in which the oftentimes all-important matters of inflection and tone are absent. We simply cannot take the chance that such a misapprehension might have influenced the final adjudication of a sentence. Our concern is heightened in this respect by the court's statement that "I think that a sentence of 151 months is more than adequate. I think it's, frankly, high, but it's the lowest sentence mandated by the Guidelines considering all the factors that apply to this case." R.106-1 at 83.

In sum, on this record, we cannot be certain that the district court properly considered and rejected Mr. Baretz' departure arguments with a full recognition of its discretion to depart downward. Such a misunderstanding constitutes legal error warranting remand. *See United States v. Hegge*, 196 F.3d 772, 774 (7th Cir. 1999).

## Conclusion

Because we have determined that the district court applied the incorrect version of the United States Sentencing Guidelines and because the record reveals that the district court misapprehended its authority to depart downward

from the applicable guideline range,[9] this case must be remanded to the district court, and the district court instructed to conduct a new sentencing.[10] As our cases require, in order to comply with the direction of the Supreme Court in *Booker*, the district court must compute the applicable guideline sentence and employ that computation as a guide in determining the actual sentence to be imposed.[11]

Accordingly, the sentence imposed by the district court is vacated and the case is remanded for resentencing.

SENTENCE VACATED; CASE REMANDED

---

[9] Mr. Baretz' remaining submissions in this appeal deal with the manner in which the district court applied the 1997 Guidelines. Because we have determined that those guidelines do not govern the calculation of the sentence in this case, any adjudication of those matters at this time would be premature.

[10] The errors that we have discussed in the text require, irrespective of *United States v. Booker*, 125 S. Ct. 738 (2005), a complete resentencing. Therefore, the limited remand procedure employed by this court in dealing with plain error under *Booker* is not implicated in this case. *See United States v Paladino*, 401 F.3d 471 (7th Cir. 2005).

[11] We pause respectfully to remind our colleagues in the district courts of the necessity of their explaining on the record the reasons for their decisions in calculating the guideline sentence and in determining the final sentence imposed. These findings are of extreme importance to this court in fulfilling its duty to review these adjudications. Sufficient detail in these findings always is important. In cases such as this one, involving relatively complicated financial transactions and relationships, such detailed findings especially are important—and appreciated by those of us who have only the cold record to guide us in our work.

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*