**UNPUBLISHED ORDER**
Not to be cited per Circuit Rule 53

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois  60604**

Argued November 29, 2005
Decided January 10, 2006

**Before**

Hon. DANIEL A. MANION,  *Circuit Judge*

Hon. ANN CLAIRE WILLIAMS,  *Circuit Judge*

Hon. DIANE S. SYKES,  *Circuit Judge*

No. 05-1019

UNITED STATES OF AMERICA,
　　　　　　　*Plaintiff-Appellee*,

　　　*v.*

DEMETRIS SIMMONS,
　　　　　　　*Defendant-Appellant*.

Appeal from the United States
District Court for the Eastern
District of Wisconsin

No. 04 CR 63

**Charles N. Clevert, Jr.**, *Judge*.

**O R D E R**

A jury in the Eastern District of Wisconsin convicted Demetris Simmons on one count of willfully dealing in firearms without a license, in violation of 18 U.S.C. § 922 (a)(1)(A) and (a)(2). The district court imposed a sentence of 56 months' imprisonment.  We affirm the conviction, but vacate the sentence and remand for further proceedings in light of *United States v. Booker*, 125 S.Ct. 738 (2005).

**I.**

After receiving several tips of illegal activity, Special Agent Paul Harding of the Bureau of Alcohol, Tobacco, Firearms, and Explosives (the "ATF") began investigating Demetris Simmons in July 2003 for unlawful sales of firearms. Checking the relevant government databases, Harding first confirmed that Simmons had no license. Then as part of his investigation, Harding arranged for a paid government informant, Victor Thomas, a former drug dealer and gang member, to attempt to buy guns from Simmons. Simmons sold firearms to Thomas on four separate occasions. As the case turns on Simmons's mental state during the sales, we recount each with some degree of specificity.

Thomas first called Simmons on July 23, 2003, after unsuccessfully attempting to contact Simmons through a mutual acquaintance. Thomas informed him that he wanted to purchase a gun, and they agreed to meet later in a Wal-Mart parking lot. Harding and other ATF agents conducted surveillance and monitored Thomas (through a concealed transmitter and tape recorder) during this and subsequent meetings. Simmons arrived with two associates and explained that he had not brought the gun with him because "he didn't want the police to pull up on him while he was bringing [Thomas] the firearm, he wanted to see if he knew [Thomas] first." Simmons further informed Thomas that he did not like to ride with firearms in his car and arranged to move the meeting to a nearby custard stand. A few minutes later, the men met at the agreed location and Thomas entered Simmons's car. Thomas gave Simmons the money, and Simmons then directed one of his associates to give Thomas a .380 caliber pistol. Thomas told Simmons and the other men that he was going to let a mutual acquaintance, who had just been robbed, use the gun.

The three remaining sales all occurred at Simmons's house in August and September 2003, with the ATF monitoring and recording each. The next purchase occurred in early August. Outside the presence of the ATF, Thomas contacted Simmons to learn whether he had firearms for sale. On August 5, Thomas called again, this time while being recorded by the ATF, and Simmons informed him that he had a Mini 14 rifle for sale. Simmons refused to meet at the custard stand, indicating that he did not want to transport the gun in his car, and the men agreed to meet at Simmons's house. When Thomas arrived, Simmons took him to an adjoining garage where Simmons retrieved a loaded Mini 14 rifle from under a parked car. Simmons explained that he had gotten the gun from a man who had been killed. Thomas gave Simmons $700 for the gun, and Thomas asked that the gun be concealed in a nearby shirt. After the sale, Simmons told an unidentified

man (who showed up at the house during the transaction) that he could get another Mini 14 rifle if the unidentified man wanted it.

The next sale occurred on August 19, when Thomas purchased a loaded Glock .45 caliber pistol from Simmons. Prior to the sale, Thomas made both recorded and unrecorded phone calls to Simmons to determine whether Simmons had a gun to sell. Once again, the transaction took place at Simmons's home. Before the sale, Simmons expressed a great deal of hesitancy in selling either the .45 Glock discussed on the phone or a .40 Glock, which Simmons had at his house. Simmons told Thomas that the .45 Glock was registered, which meant that Simmons would have to report the gun stolen. Eventually, however, Simmons decided to report that he sold the gun at a gun show. In addition to cash, Simmons wanted Thomas to provide him with a replacement gun as part of any sale. Simmons also asked Thomas if he would be interested in purchasing a .38 special or a Taurus 9 mm handgun. Ultimately, Simmons chose not to sell the .40 Glock, but agreed to sell the .45 Glock to Thomas without a replacement gun.

During the August 19 buy, Simmons and Thomas talked about gun shows. Specifically, Simmons told Thomas that he went to gun shows as an "easy" method of obtaining firearms and agreed to go with Thomas to the gun show to purchase guns. Although the men planned to meet at a gun show in early September, Simmons backed out on the day of the show. Simmons suggested that Thomas simply get a "white girl to go buy a gun [] from the show."

The final sale occurred on September 9, at Simmons's house, and involved an assault rifle. When Thomas arrived to buy the gun, Simmons was waiting outside, having locked himself out of his house. While waiting to get in, Simmons told Thomas about the SK rifle that he planned to sell him. Simmons explained that "you could scope somebody from a block with this weapon," which Thomas understood to mean that one would be able to shoot a person a block away with the gun. Eventually, Simmons retrieved the keys to the house and returned with the rifle, which was fully automatic. Simmons told Thomas that with a couple more such rifles, he could rob a bank. Thomas then bought the SK rifle from Simmons.

On September 12, the ATF arrested Simmons, and Agent Harding executed a search warrant on Simmons's residence. During the search, Harding found numerous empty gun boxes for a variety of guns, several gun-related documents, and a Taurus 9 mm pistol. One of the documents recovered was a gun show seller's card, which bore the names of a gun seller and Simmons's girlfriend. Based on these and other facts, a grand jury indicted Simmons for willfully engaging in the business of dealing firearms without a license, in violation of 18 U.S.C. §

922(a)(1)(A) and (a)(2). A jury convicted Simmons on September 15, 2004. On December 16, 2004, the district court imposed a term of 56 months' imprisonment, to run concurrently with a state prison sentence that Simmons was serving. Simmons appeals his conviction and his sentence.

## II.

### A.

Simmons first argues that the government did not present sufficient evidence to support the jury's conviction for willfully engaging in the business of dealing firearms without a license.  We review a challenge to the sufficiency of the evidence in the light most favorable to the government and will reverse only if the record is devoid of any evidence on which a rational jury could have returned a guilty verdict. *See United States v. Bonty*, 383 F.3d 575, 577-78 (7th Cir. 2004).  The statute in this case, 18 U.S.C. § 922(a)(1)(A), prohibits any person from engaging in the business of importing, manufacturing, or dealing in firearms, except licensed importers, manufacturers, or dealers.[1] The penalty provision for this statute requires a showing of a willful violation.  18 U.S.C. § 924(a)(1)(D). Simmons does not argue that he had a license nor that he was not engaged in the business of dealing in firearms; rather, he contends that the government presented no evidence establishing that he was aware of the need for a license and thus committed a willful violation as required by the penalty provision of the firearms licensing statute.

While the Supreme Court has explained that willfulness can have varying meanings depending on the context, *see Bryan v. United States*, 524 U.S. 184, 191 (1998), the Supreme Court has been absolutely clear that the willful violation language in § 924(a)(1)(D) only requires a showing of "knowledge that the conduct is unlawful." *Id*. at 192, 196.  In *Bryan*, as in this case, the Supreme Court considered

---

[1]As explained in the statutory definition of "engaged in the business" and noted by the Supreme Court in *Bryan v. United States*, 524 U.S. 185, 188 n.5 (1998), the firearms licensing requirement does not include "a person who makes occasional sales, exchanges, or purchases of firearms for the enhancement of a personal collection or for a hobby, or who sells all or part of his personal collection of firearms." 18 U.S.C. § 921(a)(21)(c).  Simmons makes a passing reference in his initial brief that "the evidence showed that Simmons collected firearms and kept firearms that he did not intend to sell," but this point was never developed either in the briefs or at oral argument.  As such, Simmons waived any argument along these lines. *See United States v. Duran*, 407 F.3d 828, 844 n.7 (7th Cir. 2005).

a § 922(a)(1)(A) violation and had to decide whether "the term 'willfully' in 18 U.S.C. § 924(a)(1)(D) requires proof that the defendant knew that his conduct was unlawful, or whether it also requires proof that he knew of the federal licensing requirement." *Id*. at 186. The Supreme Court explicitly rejected the argument that the government needed to offer proof that the defendant was aware of the licensing requirement. *See id*. at 192-95. The Court affirmed Bryan's conviction, noting that ample circumstantial evidence (including use of straw purchasers, street corner sales, and his lack of a firearms license) demonstrated that he knew his conduct to be illegal. *See id*. at 189, 200.

In this case, the government supplied sufficient evidence to support the jury's conclusion that Simmons knew his conduct was unlawful. Most damning, of course, are Simmons's own statements that evinced a concern that law enforcement might interrupt his nefarious dealings. Specifically, Simmons informed Thomas when they first met that he needed to check Thomas out before going through with the sale and that he was hesitant to bring the firearms with him in case the police unexpectedly pulled up. In the later deals, Simmons again expressed concern over having the firearms in his car and moved the meetings to his house. During the transactions Simmons behaved as a man who knew his conduct was illegal and sought to avoid police detection. Simmons's statements about gun shows further support the jury verdict on this point by illustrating his awareness of exceptions in current gun licensing and sale laws. Simmons advised Thomas that he used gun shows as an easy way to procure firearms and counseled Thomas do the same. The police found a seller's card that suggested Simmons had used his girlfriend as a straw purchaser at a show, a method he had recommended to Thomas. This evidence shows that Simmons was well aware of what constituted legal, as well as illicit, conduct in the area of firearm sales. Together, all of the evidence from the investigation clearly indicates that Simmons knew he was acting in violation of the law and was more than sufficient to support the jury's finding that Simmons willfully violated § 922(a)(1)(A) when he sold firearms without a license.

**B.**

Simmons also challenges the district court's sentencing determination. The district court sentenced Simmons to 56 months' imprisonment during the dusky period between our consideration of the sentencing guidelines in *United States v. Booker*, 375 F.3d 508 (7th Cir. 2004), and the Supreme Court's resolution of the issue in its later review of that case, *Booker*, 125 S. Ct. 738. Given the questions surrounding the viability of the guidelines in this period, the district court employed "indeterminate sentencing," in which "the Court would not be bound by the U.S. Sentencing Guidelines, and would exercise its discretion with due regard for the

facts set forth in the Presentence Report and those facts presented at trial," according to the district court's own description. The district court apparently did not consider the guidelines at all. The government and defense counsel did not object to this method.

While the district court's actions are understandable considering the confusing state of the law at the time, the district court erred in employing this indeterminate sentencing scheme. According to the Supreme Court, a sentencing court "must consult those Guidelines and take them into account when sentencing," even though they are no longer mandatory. *Booker*, 125 S.Ct. at 767; *see also United States v. LaShay*, 417 F.3d 715, 719 (7th Cir. 2005); *United States v. Baretz*, 411 F.3d 867, 877 (7th Cir. 2005). Here, the district court did not initially calculate a guidelines sentencing range and use it as the starting point of its analysis, and thus ran afoul of *Booker*.

The government argues that the district court's sentence is nonetheless reasonable and should survive, but we cannot reach that conclusion as a matter of course. The parties actively dispute the proper sentencing range. While the sentence imposed was below the statutory maximum of 60 months, if a proper guidelines calculation puts it above the advisory guidelines range, further explanation from the district court would be required. *See United States v. Dean*, 414 F.3d 725, 729-30 (7th Cir. 2005) (district court should explain any deviations from advisory guidelines range). All in all, the best course is to remand to allow the district court to make the proper findings and resentence Simmons pursuant to *Booker*.

## III.

We AFFIRM Simmons's conviction, but VACATE Simmons's sentence and REMAND for resentencing.